Mary L. HELMS, individually and as next friend of Amy T. Helms, a minor;  et al., Plaintiffs,

v.

Wilmer CODY, as Louisiana State Superintendent of Instruction; et al., Defendants,

Guy Mitchell, et al., Intervenors.

Civ. A. No. 85–5533.

United States District Court, E.D. Louisiana.

June 10, 1994.

Lee Boothby, Boothby & Yingst, Washington, DC, for plaintiffs.

Jack A. Grant, Grant & Barrow, Grenta, LA, for defendants Jefferson Parish School Bd., Barbara Turner as Superintendent of Jefferson Parish Public School System, Martin Marino as President and member of Jefferson Parish School Bd., and Polly Thomas as Vice President and member of Jefferson Parish School Bd., Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of Jefferson Parish School Bd.

Tom Rayer, Denechaud & Denechaud, New Orleans, LA, for defendant Sp. Educational Services Corp.

Drake Cutini, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant Richard W. Riley as Secretary of U.S. Dept. of Educ.

William F. Baity, Asst. U.S. Atty., Chief, Civ. Div., New Orleans, LA, for Richard W. Riley as Secretary of U.S. Dept. of Educ.

Rose Polito Wooden and James C. Hrdlicka, Asst. Attys. Gen., Office of Atty. Gen., LA Dept. of Justice, Baton Rouge, LA, for defendants Dr. Raymond K. Arveson as LA Superintendent of Public Instruction, Mary Landrieu as LA State Treasurer, and LA State Bd. of Elementary and Secondary Educ.

William T. D'Zurilla, Place St. Charles, New Orleans, for intervenors Guy and Jan Mitchell, Earline Castillon, and Edward and JacLynn Welsch.

Patricia A. Dean, Arnold & Porter, Washington, DC, for intervenors Guy and Jan Mitchell, Earline Castillon, and Edward and JacLynn Welsch.

## *OPINION*

HEEBE, District Judge.

The plaintiffs in this action are Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol. They reside within the Jefferson Parish School District and within Jefferson Parish, Louisiana.

The defendants currently remaining in this case are:

a) Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction [1];

b) Mary Landrieu as Louisiana State Treasurer;

c) Richard W. Riley [2] as Secretary of the United States Department of Education;

d) United States Department of Education;

e) Louisiana State Board of Elementary and Secondary Education (BESE);

f) Jefferson Parish School Board (JPSB);

g) Barbara Turner [3] as Superintendent of the Jefferson Parish Public School System;

h) Martin Marino [4] as President and member of the Jefferson Parish School Board;

1. At the time of the trial, the Louisiana Superintendent of Public Instruction was Wilmer Cody.

2. When originally filed, this case named William Bennett as Secretary of the United States Department of Education.

3. At the time of trial, Russell Protti was the Superintendent of the Jefferson Parish Public School System.

4. At the time of trial, Henry Hoppe was the President and a member of the Jefferson Parish School Board.

i) Polly Thomas[5] as Vice President and member of the Jefferson Parish School Board;

j) Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of the Jefferson Parish School Board[6]; and

k) the Special Educational Services Corporation.

The intervenors in this action are Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch.

Plaintiffs have challenged federal statutes, as well as Louisiana state programs, on their face and/or as administered and applied in Jefferson Parish, on the grounds that they violate the Establishment Clause of the First Amendment and the Fifth and Fourteenth Amendments. Presently before the Court are the following claims:

1. That the special education programs providing special education services through the use of public school employees on the premises of sectarian schools in Jefferson Parish, Louisiana are unconstitutional.

2. That Louisiana statutory provisions authorizing the funding of special education programs on the premises of pervasively sectarian institutions are unconstitutional on their face, and as implemented and applied.

3. That Louisiana's legislatively-adopted program for the provision of reimbursement to nonpublic schools for administrative expenses is unconstitutional.

4. That the transportation program which provides for separate transportation of public and nonpublic school children in Jefferson Parish is unconstitutional in its application.

5. That the transportation program results in excessive entanglement.

6. That the state statute authorizing a flat-rate reimbursement to parents transporting their children to school is unconstitutional on its face and as previously administered and applied.

7. That the capital expense provision of Chapter 1 of the Education Consolidation and Improvement Act of 1981 is unconstitutional on its face.

This matter came on for trial on a previous date. This Court, having heard the testimony at trial and having considered the record, the evidence, the transcript, the applicable law, and the excellent memoranda submitted by the parties, now makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), as hereafter set forth.

## *FINDINGS OF FACT*

1. Plaintiff, Mary L. Helms, is the mother of Amy T. Helms who at the time of trial was an eleventh grade student at Bonnabel High School, which is located in Jefferson Parish and is operated by the Jefferson Parish Public School System.

2. Plaintiff, Esperanza Tizol, is the mother of Herman Tizol and Alia Tizol who at the time of trial were enrolled at Congetta Trippe Janet Elementary School, which is located in Jefferson Parish and is operated by the Jefferson Parish Public School System.

3. Plaintiff, Marie Louise Schneider, has no children enrolled in the Jefferson Parish Public School System. She represents Chapter 1 parents in Jefferson Parish as the "parental advisory counsel parishwide chairperson." Doc. 260, p. 7.

4. Each of the plaintiffs is a United States citizen and citizen of the State of Louisiana, and pays either excise taxes or income taxes to the United States. Doc. 219, p. 3.

5. This Court has already found that each of the plaintiffs pays sales and other taxes to the State of Louisiana and each plaintiff pays local sales tax which ultimately benefits the Jefferson Parish Public School System. Doc. 219, p. 3. Therefore, this Court finds that the plaintiffs have standing to challenge the various state programs at issue in this case.

5. At the time of trial, Nick Giambelluca was the Vice President and a member of the Jefferson Parish School Board.

6. Elton Lagasse, Robert Wolfe, Barry Bordelon, Robert Autin, Donald Jones, Martin Marino, and Dewey Spies were all members of the Jefferson Parish School Board at the time of the trial.

6. Plaintiffs also have standing to challenge the facial validity of the "capital expenditures" provision of Chapter 1 of the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. § 2727(d). Doc. 219.

### *I. SPECIAL EDUCATION*

A. *WHETHER THE SPECIAL EDUCATION PROGRAMS PROVIDING SPECIAL EDUCATION SERVICES THROUGH THE USE OF PUBLIC SCHOOL EMPLOYEES ON THE PREMISES OF SECTARIAN SCHOOLS IN LOUISIANA, INCLUDING JEFFERSON PARISH, ARE UNCONSTITUTIONAL.*

B. *WHETHER LOUISIANA STATUTORY PROVISIONS AUTHORIZING THE FUNDING OF SPECIAL EDUCATION PROGRAMS ON THE PREMISES OF PERVASIVELY SECTARIAN INSTITUTIONS ARE UNCONSTITUTIONAL ON THEIR FACE, AS WELL AS IMPLEMENTED AND APPLIED.*

#### *FINDINGS OF FACT*

1. Plaintiffs claim that the state's special education program, that being La.Rev.Stat. §§ 17:1941–1956, as it is being administered and applied, is unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

2. Plaintiffs also make a facial challenge to the special education statutes, contending that they authorize the expenditure of tax-derived funds for the payment of the salaries and expenses of teachers and staff at pervasively sectarian institutions where the employees of those institutions, other than public school employees, provide special education services.

3. La.Rev.Stat. § 17:1941 provides that it is the duty of the state, city and parish public school systems of the state of Louisiana "to provide an appropriate, free, publicly supported education to every exceptional child who is a resident therein." La.Rev.Stat.Ann. § 17:1941 (West 1982).

4. The stated legislative purpose of the Louisiana special education statute is:

> to provide for a flexible and uniform system of special education for all children requiring such programs and related services; to provide a flexible and nondiscriminatory system for identifying and evaluating the individual needs of the child; to determine the appropriateness of the special education program; to conduct a periodic evaluation of the program and its benefit to the child; to prevent denials of equal educational opportunities on the basis of national origin, sex, economic status, race, religion, and physical or mental handicap or other exceptionalities in the provision of appropriate, free publicly supported education; and to provide such special education programs herein described and related services in the least restrictive alternative education settings.

La.Rev.Stat.Ann. § 17:1941.

5. La.Rev.Stat. § 17:1943(2) defines an exceptional child as one who is "mentally disabled, gifted and talented, hard of hearing, deaf, speech impaired, severe language disordered, visually impaired, emotionally disturbed, orthopedically impaired, hospital/homebound, other health impaired, learning disabled, which includes attention deficit disordered and dyslexia, traumatic brain injured, or autistic, and as a result may require special education or related services." La. Rev.Stat.Ann. § 17:1943(2) (West Supp.1994).

6. In Louisiana, special education is "any program of instruction within the preschool, elementary, and secondary school structures of the state, specifically designed to provide for different learning styles of exceptional children." La.Rev.Stat.Ann. § 17:1943(4) (West Supp.1994).

7. Section 17:1944(A)(1) provides that the special educational services are to "be administered at the state level by the Department of Education, with the approval of its governing authority, and on the city or parish level by parish or city school boards." La.Rev. Stat.Ann. § 17:1944(A)(1) (West Supp.1994). Section 17:1944(A)(2) provides that the office of special education services within the Department of Education "shall provide general supervision and monitoring of all education programs for exceptional children conducted within the state, including all such education

programs administered by other state or local agencies." La.Rev.Stat.Ann. § 17:1944(A)(2) (West Supp.1994).

8. La.Rev.Stat. § 17:1944(B)(13) authorizes the Department of Education "[t]o conduct or contract with any federal, state, city, parish, or *private agency,* research and development projects designed to improve the quality of special education programs or to increase the efficiency of such programs." La.Rev.Stat.Ann. § 17:1944(B)(13) (West 1982).

9. Under La.Rev.Stat. § 17:1946(A), the Department of Education must approve alternative education settings in which special education programs are to be conducted, including nonpublic day school facilities and private residential schools. La.Rev.Stat.Ann. § 17:1946(A) (West Supp.1994).

10. La.Rev.Stat. § 17:1946(C) and (D) allows a public educational agency to place an exceptional child in an approved special nonpublic day school program as an alternative education setting. La.Rev.Stat.Ann. § 17:1946(C), (D) (West 1982). Subsection (C) states that any exceptional child,

> who has been placed prior to or during the 1978–1979 school year by a public education agency in an approved special nonpublic day school as an alternative education setting because public facilities and programs were not available and who has received special education and related services in an approved special nonpublic day school during the 1978–1979 school year, shall not be transferred by the public education agency without formal parental approval.

*Id.*

11. The parties stipulated concerning special education tri-party agreements entered into between the Louisiana State Department of Education and certain approved nonpublic schools pursuant to La.Rev.Stat. § 17:1946(C). Ex. S–35. The stipulation reads:

> The Louisiana State Department of Education, by and on behalf of certain local education agencies, has entered into tri-party agreements with some approved nonpublic schools under the authority of LA.REV.STAT.ANN. 17:1946(C) for the provision of special educational services and where necessary related services as specified in an Individualized Education Program for certain handicapped children within the jurisdiction of the local education agency. Plaintiffs' Exhibit No. 239, annexed hereto as Attachment A, is an example of such a tri-party agreement between De La Salle Special Education School, and the Louisiana State Department of Education by and on behalf of the Jefferson Parish School Board for the provision of special education services to one handicapped child placed by a public agency prior to the 1978–79 school year.
>
> Each of said children listed in those tri-party agreements executed pursuant to LA.REV.STAT.ANN. 17:1946(c) has been identified as a handicapped child who is between the ages of three (3) and twenty-one (21), and who was placed by a public agency in an approved nonpublic school prior to the 1978–79 school year because the local educational agency did not provide direct services to said child.

Ex. S–35.

12. The stipulation applies to a limited number of identified exceptional children, between the ages of 3 and 21, each of whom was placed in an approved nonpublic school prior to the 1978–79 school year because "the local educational agency did not provide direct services to said child." *Id.*

13. Under La.Rev.Stat. § 17:1949, a parish or city school board or special school district is authorized to enter into a purchase of services agreement with any nonpublic school agency or institution to provide free appropriate education to exceptional children in need of special education and related services. In purchasing such services, the local school board is "authorized to negotiate a contract for special education and related services and to pay tuition or other costs not to exceed the average gross costs per educable child in the school district plus the pro rata part of the state allotment" provided in La.Rev.Stat.Ann. § 17:1956 for serving students requiring special education and related services. La.Rev.Stat.Ann. § 17:1949 (West 1982).

14. The Department of Education may contract with nonpublic agencies to provide special education and related services subject to the conditions and limitations of the statute. La.Rev.Stat.Ann. § 17:1950 (West 1982).

15. The Jefferson Parish School Board (JPSB) is a political subdivision of the State of Louisiana. It is vested with the authority to direct the operations of the Jefferson Parish Public School System (JPPSS), subject to the rules and regulations promulgated by the Louisiana State Board of Elementary and Secondary Education (BESE).

16. Special Educational Services Corporation (SESC) was established as a Louisiana nonprofit corporation in 1981. It was organized for the purpose of "assist[ing] students who are having academic and behavior problems to cope in the school environment." Doc. 250, p. 163.

17. SESC was originally funded with $1.65 million by the 1982 Louisiana legislature. Ex. P–253.

18. Since at least 1987, SESC has not received any funds from the State of Louisiana or any other governmental body. Doc. 250, p. 164.

19. At the time of trial, the sole employee of SESC was the executive director, Jan Janz, who volunteered her time to the corporation. Her paid position was with the Office of Special Education for the Archdiocese of New Orleans. *Id.* at pp. 76, 78, 105, 134.

20. The members of SESC are "[t]he respective Presidents of the Archdiocesan School Board and Diocesan School Board of the Roman Catholic Archdiocese of New Orleans, and the Roman Catholic Diocese of Lafayette, Baton Rouge, Houma–Thibodaux, and Lake Charles, and a representative to be appointed by the Bishop of the Diocese of Alexandria–Shreveport respectively." John C. Rice, Jr. Dep. at 43–44. The corporate members appoint the Board of Trustees. *Id.* at 45.

21. The Court finds that SESC is a religiously-affiliated corporation.

22. In Jefferson Parish, special education services have been provided by public school teachers to nonpublic school students on the premises of schools operated under the authority of the Archdiocese of New Orleans under a contract entered into between the JPSB and SESC. Ex. S–9.

23. JPPSS first assigned special education teachers to instruct students at nonpublic schools during the 1975–76 school year. Ex. P–253. Four teachers and four aides were placed. The reason for this placement was "the lack of classroom space in the public school system." *Id.*

24. By the 1982–83 school year, the request had increased to 105 special education teachers and 71 aides for the nonpublic schools. The estimated cost to the Jefferson Parish Public School System was $504,871.00. Ex. P–253, p. 12.

25. In the Fall of 1982, Barbara Turner Windhorst was the Director of Special Education for the Jefferson Parish Public School System and Dr. Carolyn Weddle was the Assistant Superintendent for Instructional Programs for the school system. Dr. David DeRuzzo, the Superintendent of Schools for the JPPSS, directed Dr. Weddle and ultimately Ms. Windhorst to research the issue of special education teachers assigned by the JPPSS to nonpublic schools and to provide him with information for a report to the school board. Doc. 255, p. 96.

26. In his report to the school board, Dr. DeRuzzo noted:

> The continued dramatic escalation of requests for special education teachers and aides by the approved non-public schools emphasizes three issues:
>
> a. the possible loss of student population to the parochial schools, especially at the high school level where parochial secondary schools who have never offered special education classes are now proposing them.
>
> b. will the SESC continue its source of funding and its willingness to contribute to the cost of teachers and aides?
>
> c. parents of public school special education students complain that our most experienced and best educated teachers request voluntary transfer to parochial and private settings leaving the public school special education students with some

teachers who are not certified in special education.

Ex. P–253, p. 11.

27. The Jefferson Parish School Board at its September 15, 1982 meeting directed the Superintendent

to develop a cooperative plan between the Jefferson Parish Public School System and the approved non-public schools to accomplish the following:

1. An approach to controlling the growth in the number of teachers placed in non-public schools
2. A more equitable method of placing qualified special education teachers (See Exhibit III)

Ex. P–253, p. 1.

28. On October 5, 1982, Dr. DeRuzzo sent a letter to Mr. Howard Jenkins, Superintendent of Schools for the Archdiocese of New Orleans, concerning the development of policy and procedures for the placement of special education classes and teachers in non-public schools. Ex. P–253, pp. 20–21. A committee comprised of staff from the Archdiocese and staff from the Jefferson Parish Public School System was formed to develop procedures for placement of special education classes and teachers in nonpublic schools. The goals/guidelines to be achieved were as follows:

a. Planned approach to capping and reducing Special Education classes authorized to non-public schools; and
b. An equitable plan to place special education certified teachers in the public schools before placement in non-public schools is finalized each year and during the adjust period of the school year.

*Id.* at 21.

29. The recommendations on staffing and funding emanating from negotiations between JPPSS and the Archdiocese of New Orleans, as well as the contractual agreement between JPPSS and the Jefferson Federation of Teachers, anticipated the following results:

a. That the present level of funding for teachers and aides currently working in the Archdiocesan schools will be maintained. (This excludes those teachers covered under the contractual agreement for 1982–83 with Special Educational Services Corporation.)
b. Should Special Educational Services Corporation not renew its contract as implemented during the 1982–83 session, the Archdiocese will be responsible for assuming all local costs for those teachers and aides.
c. That beginning with the 1983–84 academic year, the total local costs for any new positions or vacancies for teachers or teacher aides will be borne by the Catholic schools to which these persons are assigned.
d. That capping of the Jefferson Parish Public School System costs at the 1982–83 level will not affect any new special education classes the Archdiocese might establish; the total local costs for such classes, however, will be the responsibility of the individual schools.
e. That new classes will be allowed to be established in the Archdiocesan schools.
f. That there will be no reduction in the number so [sic] teachers over a period of time.

Ex. P–253, p. 3.

30. The report (Ex. P–253) was submitted to the Jefferson Parish School Board, and the school board approved it. Doc. 255, pp. 98–99.

31. The contract entered into between the Jefferson Parish School Board (JPSB) and Special Education Services Corporation (SESC) for the 1989–90 school year provided that the JPSB shall hire up to 14 special education teachers and up to 5 teacher assistants. Ex. S–9. These teachers and assistants were assigned to the following nonpublic schools: Chinchuba Institute for the Deaf, Immaculate Conception High School, Archbishop Rummell High School, St. Agnes Elementary School, St. Angela Elementary School, St. Benilde Elementary School, St. Christopher Elementary School, St. Francis

Xavier Elementary School, and St. Mary Magdalen Elementary School. *Id.*

32. Under the contract, the classrooms were to be provided by SESC at no cost to the JPSB. Ex. S–9. The special education programs conducted in those classrooms were to be supervised by both the JPSB and the administrator of SESC. *Id.*

33. Pursuant to the contract, SESC billed the JPSB for the cost of the special education teachers and teacher assistants provided to the nine nonpublic schools. Ex. S–9. The cost for teachers and teacher assistants for the fiscal year 1989–90 was estimated at approximately $149,583.00. *Id.*

34. State funds appropriated by the Louisiana Legislature for the provision of special education and related services for exceptional children in Louisiana are distributed to the Jefferson Parish Public School System based on the number of exceptional children served by employees of the local school board, consistent with state-required pupil/teacher ratios for the provision of services to students with particular exceptionalities.

Doc. 277, p. 90.

35. The public school system receives federal monies based on the "child count" of special education students enrolled at both public and nonpublic schools. Doc. 254, p. 136.

36. The salary of a special education teacher consists of 1) money from the minimum foundation program which is money that comes to Jefferson Parish from the State of Louisiana; and 2) the local salary supplement. Doc. 255, p. 78. In the public schools, the local salary supplement is paid by the Jefferson Parish School Board. In the nonpublic schools, the local salary supplement is paid by SESC. *Id.* SESC has agreed "to assume full responsibility for any portion of a teacher's or teacher assistant's salary and benefits not reimbursable by the State of Louisiana and/or the United States Government." Ex. S–9.

37. The minimum foundation money received from the State and the local salary supplement received from SESC are placed into the general fund of the Jefferson Parish Public School System. The salary of the special education teacher at the nonpublic school is then paid out of this general fund. Doc. 255, p. 100.

38. Since Ms. Janz became executive director of SESC in 1987, SESC has been funded by contributions from the nonpublic schools that are receiving special education services on their premises. Each school contributes a local supplement for the special education teachers to SESC. SESC has a contract with each of the participating nonpublic schools called a donor agreement which sets forth the amount of money that the nonpublic school pays to SESC. Doc. 250, pp. 96–98.

39. The nine schools listed in the contract between SESC and JPSB all make contributions to SESC. The amount contributed is "an approximation of the local supplement for the teachers ...," that is, the difference between what the state pays for the teachers' salaries and "what Jefferson Parish school district would have to come up with in order to be able to pay the total salary for the teacher." *Id.* at pp. 96–97, 99–100.

40. The JPPSS special education teachers serving students in both public and nonpublic schools are all subject to the provisions of the same Collective Bargaining Agreement. Ex. S–6.

41. Article 18(G) of the 1989–90 "Agreement between the Jefferson Federation of Teachers and the Jefferson Parish School Board" specifically addressed the issue of the placement of special education teachers at nonpublic school sites. Ex. S–6, p. 20. Section G(2) states that "[p]ositions in special education classes which are provided in non public schools and are a duplication of services provided by the Jefferson Parish Public School System shall be filled *only after* all special education positions in the Jefferson Parish Public School System have been filled by certified special education teachers." *Id.* (Emphasis added).

42. Section G(5) is an exception to the requirement set forth in Section G(2). This section states that "[t]he Board shall not involuntarily transfer special education teachers assigned to non-public schools prior

to the 1983–84 school session unless pupil-teacher ratio changes reduce teacher needs." *Id.*

43. Ms. Windhorst testified that this provision "means that those teachers who were assigned to nonpublic schools prior to the '83–'84 school year whether certified or not would remain in those settings and would not be involuntarily transferred...." Doc. 255, p. 47.

44. The Court finds that Section G(5) of Article 18, which is in the current collective bargaining agreement, was originally placed there "in order to effect a compromise agreement involving" public school teachers providing special education services at non-public schools. *Id.* at p. 50.

45. Twelve of the fourteen special education teachers currently employed by JPPSS and providing services at the non-public schools are there by reason of Section G(5) of the collective bargaining agreement (the grandfather provision). *Id.* at p. 53.

46. The Court finds that there are positions to be filled for special education teachers in the Jefferson Parish public schools. These vacancies are for teachers certified in the mild-moderate category which is the same category held by the twelve public school teachers grandfathered into teaching at the non-public schools. *Id.* at pp. 55–57.

47. Louisiana law requires that each child must receive special education in the "least restrictive environment" appropriate for the child's individual educational needs. La.Rev. Stat.Ann. § 17:1946(A)(2) (West Supp.1994).

48. The special education policies and procedures of the JPPSS are set forth in "Jefferson Parish Public School System Special Education Policies, Procedures, Practices (1989)" (hereinafter "JPPSS Special Education Handbook"). Ex. S–15.

49. The JPPSS Special Education Handbook explains that the least restrictive environment means that "[t]o the maximum extent appropriate, exceptional children, including children in public or private institutions or other care facilities, are educated with children who are not exceptional." Ex. S–15, p. 109.

50. In the special education field, a regular classroom with supplemental aids—such as speech services or visual aids—is considered the least restrictive environment for exceptional children. Doc. 250, pp. 150–51. A "resource room" program, in which a child spends 180 minutes or less of instructional time per day in the "resource room," with the remainder spent in a regular classroom, is the next least restrictive environment. *Id.* at p. 151. A "self-contained" special class is the next least restrictive environment. The student spends more than 180 minutes of instructional time in the "self-contained" special class and spends the remainder in the regular classroom. At a minimum, a student in a "self-contained" program must have homeroom, lunch, and recess with the non-handicapped students. *Id.* at pp. 151, 173–74. A "special school" program, in which the entire school day is spent in special education, at a school attended only by other exceptional children, is more restrictive still. Ms. Janz testified that a child in this setting risks learning inappropriate behaviors and is not as challenged because of the lack of interaction with his "regular peers." Doc. 250, p. 151. More restrictive is a "residential special school." Ex. S–5, p. 40. A "hospital/homebound" program is for students who cannot function in any of the more socially interactive settings. Doc. 250, p. 152.

51. "The Least Restrictive Environment rules may not be waived by any party, including the parent(s)." Ex. S–5, p. 41.

52. The Louisiana Department of Education has determined that the school system should ensure that the exceptional child is placed "in the school which the child would attend if not exceptional, unless the IEP/Placement document requires some other arrangement." Ex. S–5, p. 39.

53. Jefferson Parish special education programs are provided to two distinct types of exceptional children. The first type are those exceptional children who have been placed by a public agency in a nonpublic residential facility. These children have been determined to require educational placement in a special day school.

54. The second group of exceptional children are voluntarily enrolled in an approved

nonpublic school. They require educational placement in either a special education resource room or a special education self-contained classroom on a regular school campus.

55. The Chinchuba Institute for the Deaf is a nonpublic, independent special school which is *not* affiliated with a religious institution and where all of the students are deaf or hearing-impaired. Ex. S–9; Doc. 255, p. 35; Doc. 250, pp. 103, 163. Chinchuba is a "special nonpublic day school," as that term is used in La.Rev.Stat. § 17:1946(C)–(E) (West 1982) & (West Supp.1994).

56. Immaculate Conception High School, Archbishop Rummell High School, St. Agnes Elementary School, St. Angela Elementary School, St. Benilde Elementary School, St. Christopher Elementary School, St. Francis Xavier Elementary School, and St. Mary Magdalen Elementary School are affiliated with the Catholic Church. None of these schools is a "special nonpublic day school" as that term is used in La.Rev.Stat. § 17:1946(C)–(E).

57. In addition to the annual contract entered into between Jefferson Parish School Board and SESC for services at Chinchuba Institute for the Deaf and the eight parochial schools, an annual contract for special education teachers and assistants is also entered into between JPSB and Hope Haven/Madonna Manor School. Ex. S–10. The contract is signed by the Executive Director of Associated Catholic Charities, the Administrator of Hope Haven/Madonna Manor, the Superintendent of the Jefferson Parish School Board, and the Director of the Special Education Department, Jefferson Parish School Board. *Id.*

58. Hope Haven/Madonna Manor is a special day school for students exhibiting behavior disorders to the degree of severe emotional disturbances. Doc. 255, p. 24. All of the students are handicapped. *Id.* These students cannot be assured a least restrictive environment on a regular school campus. *Id.*

59. The agreement entered into for the 1989–90 school year provided 15 special education teachers and 15 special education assistants at Hope Haven/Madonna Manor. Ex. S–10.

60. The students at Hope Haven/Madonna Manor residential facility are placed there by the State of Louisiana, the Office of Health and Human Development and/or by the court system. Doc. 255, p. 22; Doc. 277, pp. 90–91.

61. The teachers are paid from "minimum foundation monies" and the Jefferson Parish Public School System contributes the local funding. Doc. 254, pp. 149–50.

62. The estimated cost for the 30 teachers for the 1989–90 school year was $198,121.00. It was agreed "that there is no cost incurred by Hope Haven/Madonna Manor (Associated Catholic Charities) for services stated in the agreement." Ex. S–10. The Jefferson Parish School Board was to be reimbursed by the State by way of the "minimum foundation formula." *Id.* It was further noted that "the cost to the Jefferson Parish Public School System would be greater if it assumed direct responsibility for the special education needs of children handled by **HOPE HAVEN/MADONNA MANOR.**" *Id.*

63. During the 1989–90 school year, there were approximately 103 students attending Hope Haven/Madonna Manor School. Doc. 257, p. 9.

64. No classes in religion or theology are offered at the Hope Haven/Madonna Manor school. *Id.* at p. 13.

65. There are no religious symbols in Hope Haven/Madonna Manor. *Id.*

66. A Catholic church is located near the school. *Id.* It is used for school assemblies.

67. The principal of Hope Haven/Madonna Manor is a lay person, Barbara Garland. She is employed by Associated Catholic Charities. *Id.* at p. 4. Ms. Garland reports to the administrator of Hope Haven/Madonna Manor, Robert Guasco.

68. Two Catholic sisters teach at Hope Haven/Madonna Manor.

69. All of the teachers at Hope Haven/Madonna Manor are Jefferson Parish Public School System teachers. Doc. 255, pp. 23–24.

70. Neither Hope Haven/Madonna Manor nor Chinchuba Institute for the Deaf are under the supervision of Mr. Howard J. Jenkins, the Superintendent of the Archdiocese of New Orleans School System. Doc. 250, pp. 58–59.

71. State regulations governing special education programs are contained in Louisiana Department of Education Bulletin 1706, "Regulations for Implementation of the Exceptional Children's Act" (Revised 1983). Ex. S–5.

72. Additional state policies and procedures related to special education are described in Louisiana Department of Education Bulletins 741, "Louisiana Handbook for School Administrators" (public and private) (Revised 1983); 1508, "Pupil Appraisal Handbook" (Revised 1983); and 1530, "Louisiana's IEP Handbook" (Revised 1989). Exs. D–86, S–14, and S–13.

73. The "Regulations for Implementation of the Exceptional Children's Act" (hereinafter "State Regulations") require that each school system and the Department of Education develop and formally enter into an interagency agreement. Ex. S–5 § 801. Since the relationship between the Department of Education and the school system is defined by the State Regulations "in regard to providing a free, appropriate public education to exceptional children," the interagency agreement need not define such relationships. *Id.* § 810. The purpose of an interagency agreement is to assure that state standards established to guarantee a free, appropriate public education for exceptional children are implemented by "approved public or nonpublic agencies not within the governance of the State Board...." *Id.* § 820.

74. Interagency agreements may be entered into between a city/parish school system and either "a licensed and approved nonpublic habilitation agency" or "a licensed and approved nonpublic education and habilitation agency." Ex. S–5 § 830.

75. An interagency agreement was entered into between the JPSB and SESC which was to be effective for one year beginning on July 1, 1989. Ex. S–12. It was signed by Dr. Russell J. Protti, Superintendent of the JPPSS; Jan Janz, Executive Director of SESC; and Barbara C. Adams, Director of the Special Education Department of the JPPSS. The stated purpose of the agreement was "to formalize the cooperation and to identify the responsibilities of the Jefferson Parish School Board and the Special Educational Services Corporation in order that Special Education Services be offered to the students enrolled at the Special Education[al] Services Corporation eligible schools." *Id.*

76. The interagency agreement between JPSB and SESC does not specifically provide for monitoring to determine whether the special education teacher engages in either religious discussion or religious conduct. Ex. S–12. The contract only provides that the principal of the nonpublic school "will ensure that the policies and procedures of the Jefferson Parish School Board will be followed in all areas of cooperative effort." *Id.*

77. In the interagency agreement, the Jefferson Parish Special Education Department provides the following special education services to the nine "Special Education Services Corporation schools":

A. Conduct inservices to include non public special education teachers, assistants, and administrators

B. Provide personnel to monitor special education programs and review I.E.P. records

C. Assure the coordinator's attendance at I.E.P.s when requested

D. Provide staff assistance in program development and implementation

E. Provide surrogate parent training for those students in need of surrogate parents

F. Provide all necessary LANSER tracking, I.E.P. and periodic progress forms

G. Provide personnel for data entry (LANSER) and tracking of evaluations, I.E.P.s and related services

H. Provide teachers with materials and equipment through the Material Resource Center check system

I. Provide pupil appraisal personnel supplemental salaries for the tenth (10) month of employment

J. Provide Health Services (Related, to include occupational therapy, physical therapy, audiological and hearing aid evaluations), when appropriate

K. Monitor all non public school students' evaluations to ensure compliance with Bulletin 1508.

L. Type, copy and disseminate evaluations to non public schools and parents

M. Provide materials of instruction amounting to 26% of the FY 90 EHA–B Flow–Through Budget allocated to voluntarily enrolled students

Ex. S–12.

78. Walter B. Gatlin, the Assistant Superintendent of Education, Division of Special Educational Services, Louisiana Department of Education, testified that the State sends state personnel to inspect the special education programs on the premises of certain nonpublic schools on a scheduled basis once every three years. Doc. 257, p. 64. "Programs throughout the school district are selected randomly by school and by students to ensure that the school district is adhering to all the policies and procedures for the education of the handicapped child." *Id.* at 65.

79. In their inspection, the State reviews the school records of the special education students attending nonpublic schools "very thoroughly" and confers with the principal and the teachers in the nonpublic schools. Doc. 257, p. 70.

80. Principals at nonpublic schools in Jefferson Parish at which JPPSS special education teachers serve handicapped students must by contract with the Jefferson Parish School Board enforce, apply, and follow all Jefferson Parish School Board personnel policies and procedures, including but not limited to the Collective Bargaining Agreement, the Teacher Evaluation Program, and the Teacher Assistant Evaluation Program, in the "management and supervision of the teachers" employed by the JPPSS. Ex. S–9.

81. The teaching responsibilities of each JPPSS special education teacher are described in the Individualized Education Program (IEP) of each of the teacher's students. *E.g.,* Doc. 250, pp. 130, 161. The IEP of each student describes the child's entire special education curriculum. Pursuant to state regulation, "[t]he responsibility for the development of each initial IEP rests with the [public] school system's special education supervisor." Ex. S–5, Special Ed.Regs. § 440.D.

82. Religious instruction is not described in the IEP.

83. No church or religious officials have any authority whatsoever over the content of the IEP. Doc. 250, p. 161.

84. Special education teachers must and do teach only what is outlined in the IEP. *Id.* at pp. 130, 161.

85. The JPPSS special education teachers at the nonpublic schools do not teach religion. *Id.* at pp. 131, 168; Doc. 251, p. 63; Doc. 252, p. 27.

86. The special education classrooms within the nonpublic schools are used only for special education instruction. Doc. 250, pp. 86–87, 122–23, 150–51.

87. JPPSS special education teachers at the eight Catholic schools are not required to attend any religious services. Doc. 251, pp. 63, 65; Doc. 252, pp. 26–27; Doc. 253, pp. 38, 87–88; Doc. 254, pp. 65–66.

88. JPPSS special education teachers provide grades (in addition to progress reports) on nonpublic school report cards. "[G]rading is based on the student's progression through a continuum of skills, with grades reflecting the student's effort rather than a specific amount or rate of progress." Ex. S–15, p. 25.

89. Nonpublic school principals may assign JPPSS special education teachers nonteaching custodial duties involving oversight of student safety and behavior—such as lunch duty or bus duty—only in a manner consistent with the Collective Bargaining Agreement. Ex. S–6, Art. 31; Doc. 255, p. 70.

90. Pursuant to the Collective Bargaining Agreement, JPPSS special education teachers may also be required to attend faculty meetings no more frequently than once per month, for one hour. Ex. S–6, Art. 26; Doc. 255, pp. 69–70.

91. In the contract between the JPSB and SESC, it is stated that "[t]eacher evaluation in the non-public schools falls under the auspices of the Jefferson Parish Public School System; therefore, the non-public schools must follow all policies and procedures of the Jefferson Parish Public School System governing teacher evaluation." Ex. S–9.

92. The contract between the JPSB and SESC also stipulates that in the nonpublic schools, principals and special education teachers shall participate in evaluation and special education policies and procedures. Ex. S–9.

93. The principal at the nonpublic school completes the JPPSS evaluation form for the JPPSS special education teacher assigned to that school. Doc. 251, pp. 35, 83–85, 90; Doc. 255, pp. 59–61.

94. The special education teachers teach throughout the day in self contained or resource classrooms within each Catholic school's facility. Doc. 254, pp. 23–24, 62.

95. In all schools where it provides special education services, JPPSS requires that classrooms for learning disabled students "be located in the center of the school" because a "central location makes it easier for students to get to their classroom[,] reduces the time they are in transit in the halls [and] allow[s] [the] students to be mainstreamed as needed." Ex. S–15, p. 28.

96. In most nonpublic schools in Jefferson Parish, special education classrooms are located in the main school building or on the main school campus. Doc. 250, pp. 86, 157–159; Doc. 251, pp. 9, 73–74; Doc. 253, pp. 9–10; Doc. 254, p. 60; Doc. 274, p. 38. The special education classroom is located in a portable unit at St. Christopher's Elementary School. Doc. 250, p. 159.

97. In the nonpublic schools in Jefferson Parish, there is no sign or other special designation indicating that the special education classroom or area used is a public school classroom or area. *Id.* at p. 126.

98. The parents of the special education students are informed that the special education teachers are employed by the Jefferson Parish School Board at the yearly IEP meeting. *Id.*

99. The Director of Special Education for the Jefferson Parish Public School System, Barbara C. Adams, testified that the school system is "not establishing new classes for providing teachers" at nonpublic school sites, but has continued "to provide teachers to those classes who have been in existence and by attrition to gradually phase that component out...." Doc. 254, p. 99. She admitted that the school system is not increasing on-site special education services at other nonpublic schools, and had decreased the number of participating schools since she has been special education director. *Id.* at p. 100.

100. Ms. Adams agreed that one of the reasons why the school system was not increasing the number of nonpublic schools offering special education services was because the JPPSS was now able to offer those services at public school sites. *Id.* at p. 101.

101. Ms. Adams also testified that under the current policy for the Jefferson Parish Public School System, a nonpublic school student cannot receive special education services at a public school site. Nonpublic school students can only receive "related services," such as speech therapy, at a public school site. *Id.* at pp. 125–26.

102. Louisiana's IEP Handbook, prepared by the Louisiana Department of Education, states:

> The public school system is not required to serve voluntarily enrolled students in nonpublic schools. Parents should be informed that in choosing not to accept the available free, appropriate public education, their rights and those of the student to services, due process, and procedural safeguards are limited.

Ex. S–13, p. 52.

103. At the time of trial, intervenor, JacLynn Welsch, had a son, Christopher, at St. Angela Merici Catholic School located within Jefferson Parish. Welsch Dep., p. 10. She was employed at St. Angela as a playground monitor and as a substitute teacher. *Id.* at 32–34. She also performed volunteer work in the school library. *Id.* at 35. In 1990, she

volunteered to assist Jean Douglass, a Jefferson Parish special education teacher who teaches at St. Angela Merici. *Id.* at 36.

104. Intervenor Welsch indicated that Jean Douglass provides special education services to the upper grades in a classroom which is partially partitioned. *Id.* at 37. The classroom also serves as the special education room for another special education teacher. Ms. Welsch testified that there is a crucifix in the room. *Id.* at 38.

105. Mary L. Cerise testified that she is currently employed by the Jefferson Parish Public School System as a special education teacher at St. Angela Merici. Doc. 253, pp. 4–5, 9. Prior to her employment as a special education teacher by the Jefferson Parish Public School System, she was employed by St. Angela Merici for approximately 10 years as an elementary education teacher. *Id.* at 6.

106. Mrs. Cerise did not remember for certain whether there was a sign posted at the entrance of her classroom indicating the type of classroom, but she did not think there was any designation. *Id.* at 16. She has told her students that she is employed by the Jefferson Parish Public School System. *Id.* She stated that the parents became aware of her employment when they signed the child's Individualized Education Program (IEP). *Id.* at 16–17.

107. Parent-teacher conferences are held in Mrs. Cerise's classroom and are scheduled the same day the parents have parent-teacher conferences with other teachers employed by St. Angela Merici. Doc. 253, p. 18.

108. Mrs. Cerise, in testifying about her contacts with the principal of St. Angela Merici, indicated that "we see him in the morning for a cup of coffee in the lounge and during the day he often walks in and out of the classrooms." *Id.* at 20. When asked at the trial why the principal walks into her classroom, Mrs. Cerise responded: "I suppose that's part of his job description." *Id.* at 21.

109. Mrs. Cerise testified that the principal was her immediate supervisor in that "[h]is position is to see that [she] implement[s] the program as outlined on the individual educational program and that [she is]

carrying out the instructional objectives and trying to meet the needs of each child that is in [her] care." *Id.* at 24.

110. No state employee has monitored Mrs. Cerise's classroom activities. *Id.* at 25.

111. Prior to her tenure, an employee of the Jefferson Parish Public School System would regularly monitor her files and her classroom activities at the school. *Id.* However, since she has been tenured, everything that she does is written down clearly on the IEP and "sent to an IEP specialist" and thereafter returned to her stating either that everything was all right or "this or the other had to be done." *Id.* at 25.

112. The IEP specialist, Barbara Cavallino, a JPPSS employee, did not visit St. Angela Merici during the present school year, but did visit once during the last school year. *Id.* at 26.

113. Mrs. Cerise's contact with the IEP specialist is normally by telephone and occurs when she has an "academically or IEP related" question that she wants clarified. *Id.* at 40.

114. In addition to the IEP file stored in the classroom of the special education teacher, St. Angela Merici also maintains a separate file on each student in the administrative office of the school. *Id.* at 29. Those files contain the "cumulative reports which is a copy of the child's work record and history, academic, behavioral, and what have you on each student as well as the file that keeps the current report cards." *Id.*

115. The parochial school, such as St. Angela Merici, issues the report card for each student in the school. In addition, the special education teacher, such as Mrs. Cerise, completes a progress report which is required by the Jefferson Parish Public School System for every special education student. *Id.* at 30.

116. Mrs. Cerise attends faculty meetings at St. Angela Merici on a monthly basis. *Id.* at 34. She attended one general workshop for all special education teachers sponsored by the Jefferson Parish Public School System at the beginning of the school year. *Id.* at 39.

117. During the past school year and at the end of the prior school year, the JPPSS furnished materials and supplies valued at $60.00 to each special education student at St. Angela Merici. *Id.* at 49.

118. A special education student attending St. Angela Merici who pays full tuition pays an additional $500.00 fee to help "balance out the budget." Doc. 251, p. 22.

119. A special education student attending St. Agnes pays an additional $300.00 fee. Doc. 252, p. 11. These fees are used to provide a "donation" to SESC. *Id.* at 12.

120. The Jefferson Parish Public School System does not charge tuition for any of the special educational services stated on the IEP. Doc. 254, p. 154.

121. According to the "Regulations for Implementation of the Exceptional Children's Act" prepared by the Louisiana Department of Education, "[t]he term 'free' does not preclude incidental fees normally charged to nonhandicapped children or their parent(s)/guardian(s) as a part of the regular educational program." Ex. S–5, p. 17.

122. The principal of the nonpublic school is the supervisor and "formal evaluator" of the special education teachers in that school. Doc. 254, pp. 142–44; Doc. 255, pp. 59–61.

123. The special education teacher at a nonpublic school site is considered by the personnel department of the Jefferson Parish Public School System to be part of the faculty of the nonpublic school. Doc. 255, p. 69.

124. Ms. Janz has "general supervision" of the special education program provided on the premises of the nonpublic schools by the contract between SESC and the JPPSS. Doc. 250, p. 82. She visits the special education classrooms and monitors the evaluations and the IEPs of the special education students that are on file. *Id.* at 85.

125. Barbara Turner Windhorst, the director of special education from June of 1982 until January of 1987, was not aware of any policy established by the Jefferson Parish Public School System which required the director of special education to observe whether religious symbols were present in the special education classrooms. Doc. 255, p.

73. She did not investigate for the presence of religious symbols, and did not recall whether any religious symbols were present in the special education classrooms. *Id.* at 73–74.

126. Ms. Janz testified that she did not specifically monitor for religious symbols in the special education classrooms, but that if she observed a religious symbol in the classrooms, she "would ask that they remove it." Doc. 250, p. 188.

127. The State of Louisiana has no policy that requires its employees to inspect the special education classrooms in nonpublic schools for religious symbols. Doc. 257, p. 94.

128. The Court finds that special education teachers employed by the Jefferson Parish School Board provide special education services on the premises of parochial schools.

129. The Court finds that there was no financial incentive for the parents of special education students to choose a nonpublic school. In fact, it is undisputed that the students would have received special education at no cost in the public schools. Instead, the parents of special education students elected to pay an extra charge, in addition to the regular tuition, in order for their children to attend a parochial school.

130. The State of Louisiana is presently disbursing funds to Jefferson Parish to provide special education services to all qualified children in Jefferson Parish, whether they attend public or nonpublic schools.

131. The Court finds that no state, federal, or Jefferson Parish funds are paid directly to SESC or to the parochial schools. Rather, SESC contributes monies to the Jefferson Parish School Board to help pay for the salaries of the JPPSS special education teachers located at the parochial schools. SESC receives its monies from the individual schools providing the special education services.

132. The Court finds that the parochial schools have received a direct economic benefit by furnishing special education services on their premises. The parochial schools receive tuition and a special education sur-

charge from the special education students, yet they are not responsible for the full salaries of the JPPSS special education teachers. The JPPSS special education teachers are paid by the Jefferson Parish School Board with funds primarily obtained from the State of Louisiana and supplemented by the parochial schools through SESC.

133. The Court also finds that if the special education services were not provided at the nonpublic schools, those special education students would be compelled to attend public schools which provide the necessary services at no charge to the parents. Thus, the nonpublic schools would be deprived of an economic benefit, that is, the tuition and the special education surcharge received from the special education students.

## *CONCLUSIONS OF LAW*

1. The Establishment Clause of the First Amendment to the Constitution states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.

2. The Establishment Clause has been applied to state governments through the Fourteenth Amendment. *Everson v. Board of Education of Ewing Township,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947).

3. An institution can be deemed "pervasively sectarian" if within that institution " 'religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission.' " *Bowen v. Kendrick,* 487 U.S. 589, 610, 108 S.Ct. 2562, 2574, 101 L.Ed.2d 520 (1988) (quoting *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973)).

4. The Court has already determined that the parochial schools operated under the auspices of the Archdiocese of New Orleans are pervasively sectarian. Doc. 220. Thus, the Court finds that Immaculate Conception High School, Archbishop Rummell High School, St. Agnes Elementary School, St. Angela Elementary School, St. Benilde Elementary School, St. Christopher Elementary School, St. Francis Xavier Elementary School, and St. Mary Magdalen Elementary School are pervasively sectarian.

5. No evidence was submitted at the trial to show that Chinchuba Institute for the Deaf is a pervasively sectarian institution. Thus the Court finds that Chinchuba Institute for the Deaf is not a pervasively sectarian institution.

6. The Court finds that Hope Haven/Madonna Manor is not a pervasively sectarian institution.

7. In 1971, the Supreme Court decided *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971), which set forth a three part test to analyze Establishment Clause cases: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster 'an excessive government entanglement with religion.' " (Citations omitted). The *Lemon* test has been much criticized by various Justices, but the decision has not yet been overruled. *See Lamb's Chapel v. Center Moriches Union Free School Dist.,* ––– U.S. –––, ––– n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993). The *Lamb's Chapel* majority noted in a footnote that:

> there is a proper way to inter an established decision and *Lemon,* however frightening it might be to some, has not been overruled. This case, like *Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), presents no occasion to do so.

*Id.* Thus even though *Lemon* has not been overruled, its continuing vitality appears to be in question.

8. In *Zobrest v. Catalina Foothills School District,* ––– U.S. –––, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), the United States Supreme Court most recently addressed the Establishment Clause. Chief Justice Rehnquist delivered the opinion of the Court. The Supreme Court did not apply the *Lemon* test, even though the Court of Appeals had applied *Lemon. Id.* ––– U.S. at –––– - ––––, 113 S.Ct. at 2464–65. Instead the *Zobrest* Court applied the reasoning in *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), and *Witters v. Washington Dep't of*

*Services for Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), two cases decided using the *Lemon* test. *Id.* — U.S. at — - —, 113 S.Ct. at 2466–67. The *Zobrest* Court found that the facts in that case more closely resembled *Mueller* and *Witters,* rather than *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), which also were decided using the *Lemon* test. *Id.* — U.S. at — - —, 113 S.Ct. at 2468–69. In *Mueller* and *Witters,* the Establishment Clause challenges were rejected; in *Meek* and *Ball,* however, the state statutes were struck down as being in violation of the Establishment Clause. *Zobrest,* — U.S. at — - —, 113 S.Ct. at 2466–69.

9. The *Zobrest* Court held that the Establishment Clause does not bar a school district from furnishing a handicapped child with a sign-language interpreter at a parochial school "in order to facilitate his education." — U.S. at —, 113 S.Ct. at 2469. The *Zobrest* Court found important the manner of funding of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1485. First, the Court found that providing the sign-language interpreter did *not* "relieve[ ] sectarian schools of costs they otherwise would have borne in educating their students." *Id.* — U.S. at —, 113 S.Ct. at 2468. Second, the Court found that "any attenuated financial benefit that parochial schools do ultimately receive from the IDEA is attributable to 'the private choices of individual parents.' " *Id.* — U.S. at —, 113 S.Ct. at 2469. Third, parochial schools are only "incidental beneficiaries" and handicapped children are the primary beneficiaries of the IDEA. *Id.* Finally, the *Zobrest* Court found that "the function of the IDEA is hardly 'to provide desired financial support for nonpublic, sectarian institutions.' " *Id.* (quoting *Witters,* 474 U.S. at 488, 106 S.Ct. at 752).

10. The *Zobrest* Court highlighted the fact that the program did not create a "financial incentive for students to undertake sectarian education." — U.S. at —, 113 S.Ct. at 2467. The "only indirect economic benefit" to the parochial school was perhaps the child's tuition, and even this benefit is based on the presumption that without the interpreter, the deaf child would have gone to another school and the parochial school would not have been able to fill that child's spot. *Id.* — U.S. at —, 113 S.Ct. at 2468.

11. The *Zobrest* Court stated that the Supreme Court has "consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit." *Id.* — U.S. at —, 113 S.Ct. at 2466.

12. The Court finds that the parents of the special education students in the eight parochial schools in Jefferson Parish operated by the Archdiocese of New Orleans "have chosen of their own free will" to place their children in a "pervasively sectarian environment." *Id.* — U.S. at —, 113 S.Ct. at 2469.

13. Since the facts of the instant case also involve the presence of a public employee on the premises of a parochial school, this Court will follow the example of the *Zobrest* Court and will decide whether the instant case more closely resembles *Mueller* and *Witters* or *Meek* and *Ball.*

14. The *Zobrest* Court distinguished *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), which struck down public school programs which provided public school teachers on private school premises as well as instructional equipment and material. The *Zobrest* Court found that the programs challenged in *Ball* "in effect subsidize[d] the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects." — U.S. at —, 113 S.Ct. at 2468. On the other hand, the providing of a sign-language interpreter on the premises of a sectarian school was not found by the *Zobrest* Court to "amount to 'an impermissible "direct subsidy" ' of the sectarian school, because the sectarian school was "not relieved of an expense that it otherwise would have assumed in educating its students." *Id.* — U.S. at —, 113 S.Ct. at 2468–69.

15. In *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Supreme Court found unconstitutional a Pennsylvania statute which provided "auxiliary services" to nonpublic school children with the appropriate special need. The services were provided only on the premises of the nonpublic schools by personnel employed by the public school system. "Auxiliary services" included teaching and related services for exceptional children. *Id.* at 353, 95 S.Ct. at 1757.

16. In *Aguilar v. Felton,* 473 U.S. 402, 421, 105 S.Ct. 3232, 3242–43, 87 L.Ed.2d 290 (1985), Justice O'Connor noted in her thought provoking dissent that the *Meek* Court set forth the theory "that public school teachers who set foot on parochial school premises are likely to bring religion into their classes, and that the supervision necessary to prevent religious teaching would unduly entangle church and state." The *Aguilar* majority held that "the detailed monitoring and close administrative contact" by public authorities in sectarian schools, necessary when public employees teach in sectarian schools, causes excessive entanglement between church and state. *Id.* at 412–14, 105 S.Ct. at 3237–39.

17. In *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the Supreme Court upheld a Minnesota statute which allowed state taxpayers to deduct expenses on their state income tax incurred in providing for the education of their children. The Court pronounced that it has consistently rejected the argument that " 'any program which in some manner aids an institution with a religious affiliation' violates the Establishment Clause." *Id.* at 393, 103 S.Ct. at 3066. The Court emphasized the fact that this public assistance was granted to parents of children attending both public and nonpublic schools. *Id.* at 398, 103 S.Ct. at 3068–69. Another "material consideration" was the fact that the State transmitted the aid to the parents, rather than to the schools themselves. *Id.* at 399, 103 S.Ct. at 3069. The aid to the parochial schools was then made available through the individual parents who made private choices to send their children to parochial schools. *Id.* The *Mueller* Court found this to be an "attenuated financial benefit, ultimately controlled by the private choices of individual parents, that eventually flows to parochial schools. . . ." *Id.* at 400, 103 S.Ct. at 3070.

18. In *Witters v. Washington Department of Services for the Blind,* 474 U.S. 481, 482, 106 S.Ct. 748, 748–49, 88 L.Ed.2d 846 (1986), the Supreme Court found that the First Amendment did not preclude the State of Washington from providing assistance to a blind person studying at a Christian college under a state vocational rehabilitation assistance program. The Court noted that "[i]t is well settled that the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution." *Id.* at 486, 106 S.Ct. at 751. However, the Court also enunciated that a "State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is 'that of a direct subsidy to the religious school' from the State." *Id.* at 487, 106 S.Ct. at 751. The *Witters* Court then examined the aid granted to the petitioner to determine under which category it best corresponded. *Id.*

19. As in *Mueller,* the *Witters* Court emphasized to whom the aid was paid, individuals or the parochial schools themselves. The *Witters* Court noted that the financial assistance was paid directly to the student who then paid the educational institution. 474 U.S. at 487, 106 S.Ct. at 751. Thus, as opposed to the situation in *Ball,* the aid "that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients." *Id.* Thus "the decision to support religious education is made by the individual, not by the State." *Id.* at 488, 106 S.Ct. at 752.

20. The Court finds that the situation in the instant case more closely resembles *Meek* and *Ball,* rather than *Mueller* and *Witters.* The Jefferson Parish Public School System provides special education teachers to teach on the premises of nonpublic schools. The special education teachers at the nonpublic schools are paid by the JPPSS with minimum foundation funds provided by the State and funds provided by SESC. The Court finds that the assistance is given di-

rectly to the schools themselves, and not indirectly through the parents or students.

21. The Court finds relevant the statements made by Judge Friendly as quoted in the *Ball* decision:

> Under the City's plan public school teachers are, so far as appearance is concerned, a regular adjunct of the religious school. They pace the same halls, use classrooms in the same building, teach the same students, and confer with the teachers hired by the religious schools, many of them members of religious orders. The religious school appears to the public as a joint enterprise staffed with some teachers paid by its religious sponsor and others by the public.

473 U.S. at 392, 105 S.Ct. at 3227 (quoting *Felton v. Secretary, United States Dep't of Educ.*, 739 F.2d 48, 67–68 (1984)).

22. The Court concludes that the JPPSS special education teachers are "performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." *Meek*, 421 U.S. at 371, 95 S.Ct. at 1766.

23. To ensure that JPPSS special education teachers remain "religious neutral," the State and Jefferson Parish would have to "engage in some form of continuing surveillance to ensure that those restrictions were being followed." *Id.* at 372, 95 S.Ct. at 1766. This surveillance could result in administrative and political entanglement between the parochial schools and the State and Jefferson Parish. The *Meek* Court found this potential for administrative and political entanglement to be one of the evils that the Establishment Clause was designed to protect against. *Id.*

24. Considering all of the circumstances, applying the holdings of *Meek* and *Ball*, the Court is compelled to find that the special education statute, La.Rev.Stat. §§ 17:1941–1956, which allows state-paid special education teachers to teach on the premises of pervasively sectarian institutions, violates the Establishment Clause as applied.

25. Because neither Chinchuba Institute for the Deaf nor Hope Haven/Madonna Manor is a pervasively sectarian institution, the Court finds that there is no significant risk that JPPSS special education teachers at Chinchuba Institute for the Deaf and Hope Haven/Madonna Manor will "have the primary effect of advancing religion" or will cause "excessive entanglement" of government with religion. Thus, the Court finds that the special education statute which allows state-paid special education teachers to teach on the premises of Chinchuba Institute for the Deaf and Hope Haven/Madonna Manor does not violate the Establishment Clause.

26. Plaintiffs have also asked this Court to decide whether the Louisiana statutory provisions, specifically La.Rev.Stat. §§ 17:1944, 17:1946, 17:1949, and 17:1950, authorizing the funding of special education programs on the premises of pervasively sectarian institutions are unconstitutional on their face.[7]

27. Plaintiffs contend that La.Rev.Stat. §§ 17:1944, 17:1946, 17:1949, and 17:1950, which authorize state or local school districts to enter into contractual arrangements with nonpublic institutions for the provision of special education programs, do not contain any legislative restriction to protect against the unconstitutional fusion of state and sectarian activities and/or the providing of sectarian education, training, or other activities at public expense.

28. In *Bowen v. Kendrick*, 487 U.S. 589, 610, 108 S.Ct. 2562, 2575, 101 L.Ed.2d 520 (1988), the Court held that "a relevant factor in deciding whether a particular statute on its face can be said to have the improper effect of advancing religion is the determination of whether, and to what extent, the statute directs government aid to pervasively sectarian institutions."

7. Plaintiffs also claimed that La.Rev.Stat. §§ 17:1944, 17:1946, 17:1949, and 17:1950 in particular are unconstitutional as applied. Since the Court has now ruled that La.Rev.Stat. §§ 17:1941–1956, which allow state-paid special education teachers to teach on the premises of pervasively sectarian institutions, are unconstitutional as applied, the Court finds that ruling to be controlling.

29. As in *Bowen,* the Court finds that nothing on the face of La.Rev.Stat. §§ 17:1944, 17:1946, 17:1949, or 17:1950, which permit contractual arrangements with nonpublic institutions for the provision of special education programs, indicates that "a significant portion" of either state or local school district funds will be disbursed to "pervasively sectarian" institutions. *Bowen,* 487 U.S. at 610, 108 S.Ct. at 2575.

30. The *Bowen* Court noted that the Supreme Court has never stated that a "*statutory* restriction" expressly preventing the use of state or local funds for religious purposes is constitutionally required. 487 U.S. at 614, 108 S.Ct. at 2577 (Emphasis added). The Court thus finds that such a restriction is not required.

31. The Court finds that La.Rev.Stat. §§ 17:1944, 17:1946, 17:1949, and 17:1950 do not violate the Establishment Clause on their face.

## *II. THE REQUIRED SERVICES REIMBURSEMENT PROGRAM*

*WHETHER LOUISIANA'S LEGISLATIVELY-ADOPTED PROGRAM FOR THE PROVISION OF REIMBURSEMENT TO NONPUBLIC SCHOOLS FOR ADMINISTRATIVE EXPENSES IS CONSTITUTIONAL.*

### *FINDINGS OF FACT*

1. The plaintiffs challenge the facial validity of La.Rev.Stat.Ann. §§ 17:361–365 (West 1982), the "Reimbursement of Required Costs" statute, and challenge the statute as applied.

2. La.Rev.Stat. §§ 17:361–365, the "Reimbursement of Required Costs" statute, establishes a program for reimbursing approved nonpublic schools for their actual costs incurred in maintaining records and providing administrative services that are required by state or local law, rule or regulation.

3. La.Rev.Stat. § 17:361 specifically provides:

> The superintendent of education, in accordance with rules and regulations adopted by the Board of Elementary and Secondary Education, shall annually reimburse each approved nonpublic school, for each school year beginning on and after July, 1979, an amount equal to the actual cost incurred by each such school during the preceding school year for providing school services, maintaining records and completing and filing reports required by law, regulation or requirement of a state department, state agency, or local school board to be rendered to the state, including but not limited to any forms, reports or records relative to school approval or evaluation, public attendance, pupil health and pupil health testing, transportation of pupils, federally-funded educational programs including school lunch and breakfast programs, school textbooks and supplies, library books, pupil appraisal, pupil progress, transfer of pupils, teacher certification, teacher continuing education programs, unemployment, annual school data, and any other education-related data which are now or hereafter shall be required of such nonpublic school by law, regulation or requirement of a state department, state agency, or local school board.

La.Rev.Stat.Ann. § 17:361 (West 1982).

4. The statute authorizes reimbursement to the nonpublic school for three separate and distinct activities: 1) the provision of school services; 2) the maintaining of records; and 3) the completing and filing of reports. La.Rev.Stat.Ann. § 17:361.

5. La.Rev.Stat. §§ 17:362 and 17:364 provide that no approved nonpublic school may receive a payment pursuant to La.Rev.Stat. § 17:361 unless the school has submitted to the superintendent an application containing the information and documentation required by the superintendent, and the superintendent has approved the application. La.Rev. Stat.Ann. §§ 17:362, 17:364 (West 1982).

6. La.Rev.Stat. § 17:363 further requires that each school which seeks reimbursement "shall maintain a separate account or system of accounts for the expenses incurred in rendering the required services for which reimbursement is authorized by R.S. 17:361."

La.Rev.Stat.Ann. § 17:363 (West 1982). The records and accounts "shall contain such information and be maintained in accordance with regulations adopted by the [Board of Elementary and Secondary Education]." *Id.*

7. In addition, § 17:363 provides that "[i]n promulgating such regulations concerning records and accounts and in requiring supportive documents ... the superintendent *shall implement* the audit procedures provided in R.S. 17:365." *Id.* (Emphasis added).

8. "The records and accounts for each school year shall be preserved at the school until the completion of such audit procedures." La.Rev.Stat.Ann. § 17:363.

9. Section 17:365 states:

> No application for reimbursement ... shall be approved except upon such audit of vouchers or other documents by the superintendent as is necessary to insure that such payment is lawful and proper.
>
> The legislative auditor *may* from time to time examine ... any and all accounts and records of a school which have been maintained pursuant to this Part in support of an application for reimbursement, for the purpose of determining the cost to such school of rendering the services referred to in R.S. 17:361. If after such audit it is determined that any school has received funds in excess of the actual cost of providing such services, such school shall immediately reimburse the state in such excess amount.

La.Rev.Stat.Ann. § 17:365 (West 1982) (Emphasis added).

10. The Court finds that there is no provision in La.Rev.Stat. §§ 17:361–365 specifically prohibiting the payment of administrative expenses relating to sectarian activity that may occur at the school.

11. The Court finds that there is no provision in La.Rev.Stat. §§ 17:361–365 requiring reimbursement only for the selection, administration, and grading of standardized tests approved by the State of Louisiana, and not for any teacher-prepared tests.

12. Pursuant to La.Rev.Stat. §§ 17:361–365, the Louisiana Board of Elementary and Secondary Education (BESE) has promulgated regulations governing the administration of the required costs reimbursement program. These are called "Regulations of Louisiana State Board of Elementary and Secondary Education Pursuant to Louisiana Revised Statutes 17:361–17:365" (hereinafter "BESE Regulations"). Ex. D–3; Doc. 265, pp. 92–94. The BESE Regulations have been in effect continuously since 1980, when they were promulgated, through the date of the trial. Ex. D–2, p. 2.

13. Section 2(a) of the BESE Regulations sets forth that the nonpublic school seeking reimbursement "shall submit an application ... and shall submit completed reimbursement worksheets as may be required by the Superintendent of Education." Ex. D–3 § 2(a).

14. The BESE Regulations also require that schools seeking reimbursement maintain backup documentation in support of their reimbursement request, including (1) separate records of expenditure accounts for each required service; (2) separate employee time records indicating the amount of time that each employee devoted to each service for which reimbursement is requested; (3) individual employee salary records; and (4) a receipt file for paid bills for which reimbursement is sought. Ex. D–3 § 2(b)(1)–(4).

15. Section 4(a) of the BESE Regulations states that "to be eligible for reimbursement for required services, a nonpublic school must be approved by the Board of Elementary and Secondary Education ... and must be in compliance with the order of the court in the case of *Brumfield vs. Dodd.*" Ex. D–3 § 4(a).

16. Section 5 of the BESE Regulations entitled "Auditing" states: "(a) No application for reimbursement under this part shall be approved except such audit of receipts or other documents by the Superintendent as is necessary to insure that such payment is lawful and proper." Ex. D–3 § 5. In addition, the legislative auditor may from time to time examine the accounts and records of the nonpublic school "for the purpose of determining the cost to such school of rendering the services referred to in these regulations and Revised Statutes 17:361." *Id.*

17. Section 6 of the BESE regulations sets forth an appeals procedure. A nonpublic school may appeal an audit conducted by either the superintendent of education or the legislative auditor to the Board of Elementary and Secondary Education. Ex. D–3 § 6.

18. Section 7(c) states that "[a] nonpublic school may designate another legal entity to receive the reimbursement to which said nonpublic school is entitled under the provisions of the required services act by providing the Superintendent of Education with an authorization to that effect from the governing authority of the nonpublic school." Ex. D–3 § 7(c).

19. The BESE Regulations do not make any specific reference to whether reimbursement is allowed for either teacher-prepared or standardized tests.

20. "Instructions for Completing the Required Services Form" (hereinafter "Instructions") are provided by the Louisiana Department of Education to the administrators of nonpublic schools. Exs. D–2 & D–4. "The forms require the school to indicate the number of hours consumed by each type of employee in a particular task and the cost to the school of that employee's time." Ex. D–2, p. 2. Both the required services form and the Instructions have been used by the State "continuously from at least 1980" to the date of trial. *Id.*

21. The Instructions do not make any reference to reimbursement for either teacher-prepared or state-prepared tests.

22. The Louisiana Department of Education mails the BESE Regulations and a required services form (hereinafter "claim form") once a year to the eligible nonpublic schools. Doc. 265, p. 94.

23. The claim forms are to be filed with the Louisiana Department of Education by September 30 of each year with a grace period to October 15. *Id.* at 67.

24. The claim form lists all of the categories of mandated administrative expenses for which a nonpublic school may seek reimbursement. The categories include:

(1) pupil attendance reporting;

(2) record maintenance;

(3) nonpublic school annual reports;

(4) transportation;

(5) inspections;

(6) textbooks and supplies;

(7) ESEA Titles I and IV–B;

(8) special education;

(9) testing program;

(10) teacher certification;

(11) continuing education; and

(12) food and nutrition program.

Ex. S–32.

25. The claim form also lists a time "parameter" for each category of mandated administrative expenses for which a nonpublic school may seek reimbursement. *Id.*

26. The "Reimbursement of Required Costs" statute became effective July 11, 1980. La.Rev.Stat.Ann. §§ 17:361–365 (West 1982). In the summer of 1980, a committee of twenty to twenty-five members was formed to make recommendations as to "how the required services law could be implemented." Doc. 254, pp. 35–36, 57. The committee, comprised of both nonpublic school personnel and members of the state Department of Education, did not devise the claim form itself. *Id.* However, the committee did discuss and make recommendations as to parameters and hours. *Id.* at 36–37. It is unclear to the Court whether the committee's recommendations were adopted, but time parameters apparently were included on the claim form used at the inception of the required services reimbursement program.

27. Number 4 of the Instructions provided by the Louisiana Department of Education states: "Parameters (maximums) for reporting by function and personnel type are included on the form. The number of hours actually recorded may vary from school to school. If the parameters are exceeded, additional auditing may be required." Ex. D–4.

28. The BESE Regulations do not define "parameters" or make any reference at all to "parameters."

29. Joseph F. Kyle, Deputy Superintendent for Management and Finance in the Louisiana Department of Education from

March 12, 1984 to March 14, 1988, testified concerning his department's administration of the nonpublic school reimbursement program. Doc. 264, pp. 86–87. He stated "I don't know what parameters mean" when asked whether he attempted to ascertain if the information contained on the claim forms was within the parameters set forth on the form. *Id.* at 120.

30. Graig Luscombe, Deputy Superintendent for Management and Finance in the Louisiana Department of Education at the time of trial, testified that there were two persons in his office directly involved in handling the claims for reimbursement for nonpublic school administrative expenses. Doc. 258, pp. 55, 100–101. Jennings Cleveland, a Fiscal Officer 7 with the Bureau of School Finance and Budget of the Louisiana Department of Education, was specifically responsible for the administration of the reimbursement program. Doc. 265, pp. 61–62; Doc. 264, pp. 127–28; Doc. 258, p. 101. Magdalen Marchiafava was the "staff person who prepares documents to actually cause the flow of the money." Doc. 258, p. 101.

31. Mr. Cleveland testified that the time parameters are "guidelines" for the persons filling out the claim forms. Doc. 265, p. 145. The guideline "is a general consensus of the particular laws in that area ... and is going to vary from place to place." *Id.*

32. Mr. Cleveland and Ms. Marchiafava were the only two persons who would question "whether the amount that is claimed falls within what is considered reasonable within the guidelines." *Id.* at 146, 149.

33. Mr. Cleveland testified that "[a]ny local ordinance, any local regulation, any public health regulation, any BESE regulation, anything that would require them to do something" could be used as a basis for a nonpublic school reimbursement claim. *Id.* at 97.

34. The Bureau of School Finance and Budget of the Louisiana Department of Education does not keep records of all of the local regulations of the 64 parishes of the state. *Id.*

35. Certain nonpublic schools in Louisiana have filed claim forms with the State with recorded figures that exceed the parameters stated on the forms. *Id.* Most of these schools have explained to Mr. Cleveland why the parameters were exceeded. Mr. Cleveland then advised these schools that have exceeded the parameters that if they "leave in [their] files an audit trail that in case this program is ever audited that they can check it that's okay." *Id.* at 72.

36. The Court finds that the State Department of Education, in processing claim forms under the required services reimbursement program, does not require that the amounts recorded by the nonpublic schools be within the time parameters. *Id.*

37. Mr. Cleveland spot checks approximately 15 claim forms to "see if the math is correct" and then forwards the forms to Ms. Marchiafava, an accounting analyst with the Bureau of School Finance and Budget. *Id.* at 5, 67, 69.

38. Ms. Marchiafava has instructions from Mr. Cleveland "to take the bottom line and set that up as the amount of the claim." *Id.* at 67. She enters all of the information on the claim forms into the computer. *Id.* at 9. Once all of the information is entered into the computer, Ms. Marchiafava arrives at a grand total and she prints "a hard copy." *Id.* at 20. She compares the hard copies from year to year "to see if there [are] any astronomically large figures or anything that looks strange ... in the comparison." *Id.* If she discovers "a figure that has changed significantly," Ms. Marchiafava brings it to Mr. Cleveland's attention. *Id.* at 21.

39. Ms. Marchiafava noted a discrepancy in the 1989 grand total from the seven schools in the Houma/Thibodaux diocese. *Id.* at 21. The schools explained the discrepancy to her on the telephone. *Id.* at 24. Mr. Cleveland reviewed the seven claim forms, before ultimately paying the higher amount claimed. *Id.* at 25.

40. Ms. Marchiafava recalled a school which had overreported its required costs and so refunded money to the State this year. *Id.* at 22.

41. Once the legislature makes the appropriation for the nonpublic school reimbursement program, Mr. Cleveland calculates the percentage due each school on a pro rata

basis and gives that percentage to Ms. Marchiafava. The computer then generates the amount to be paid to each school. *Id.* at 11, 69–70.

42. The State currently mails out thirty checks for the nonpublic school reimbursement program. *Id.* at 19.

43. The Court finds that the Louisiana Department of Education does not check the underlying documents that the nonpublic schools rely on in completing their claim forms, does not check the claim forms to determine whether the amounts claimed are within the parameters listed, and does not attempt to verify the information contained on the claim forms. *Id.* at 72–73; Doc. 264, p. 120.

44. For the 1988–89 school year, the Louisiana legislature appropriated approximately $3,587,000 for the nonpublic school reimbursement program. These funds were paid out by October 31, 1989. Doc. 265, pp. 103–104.

45. For 1988 and 1989, the State reimbursed the nonpublic schools for approximately 24% of the expenditure amounts which the schools claimed. The Louisiana legislature did not appropriate sufficient funds for full reimbursement. *Id.* at 143.

46. Since the 1984–85 school year, the Louisiana Department of Education has not reimbursed any eligible, approved, nonpublic school for more than 50% of the amount requested by the school. Doc. 336, p. 74, Stip. Fact 59.

47. Leonard J. Fine, formerly Assistant Superintendent for Business Management of the Department of Education of the Archdiocese of New Orleans, prepared an undated memorandum to assist the schools operating under the auspices of the Archdiocese in completing their claim forms (hereinafter "Fine memorandum"). Exs. P–292; D–1. The Fine memorandum describes in detail the activities which are included in each of the twelve categories specified in the claim form. His information "was taken directly from the state department's issuance of the categories and what would fall under each of those categories." Fine 9/16/87 dep., p. 172.

48. Category 9 "Testing Program" was described in the Fine memorandum as follows: "Selecting test; determining number of tests; ordering; administering; returning for grading; follow-up questionnaire; interpreting; recording." Ex. P–292, p. 5. This language was identical to language used by the State with the exception of the addition of "follow-up questionnaire." Fine 9/16/87 dep., p. 173. Any changes made by Mr. Fine "were made after a consultation with the state department." *Id.* at 174. There was no reference to either state-prepared tests or teacher-prepared tests in the Fine memorandum.

49. On March 23, 1981, John C. Rice, Jr., Associate Superintendent for Government Programs, Louisiana Catholic Conference, prepared a memorandum to Catholic Administrators to assist them in completing the "Required Services Report." Ex. P–304. The description of Category 9 "Testing Program" was identical to the description in the Fine memorandum.

50. In the case of forms completed by the parochial schools operated within the Archdiocese of New Orleans, the principals of the individual schools send the forms to the Archdiocese of New Orleans Office of Education, which collates the completed forms and sends them to the Louisiana Department of Education with a cover sheet indicating the claims submitted by each school. Fine 9/16/87 dep., pp. 174–175.

51. The Louisiana Department of Education annually mails to the Office of Education of the Archdiocese one check equal to the sum of all reimbursement payments to be made to Catholic schools operated within the Archdiocese, along with a printout indicating the reimbursement amount due each school. The Archdiocese then pays each school the reimbursement amount indicated on the printout. *Id.* at 175, 183–84.

52. Marie K. Cannon, the principal of St. Anthony School in Gretna, Louisiana, testified that her school participated in the nonpublic school required services program. The reimbursement monies went to the pastor of St. Anthony Parish. Ms. Cannon, however, was responsible for the preparation

of the claim and for submission of the claim for reimbursement. Doc. 260, pp. 54–56.

53. Ms. Cannon stated that at the beginning of the school year, the forms are presented to the faculty and explained to them. *Id.* at 56. She collects the claim forms every quarter, and then issues new forms to the teachers for the next quarter. At the end of the school year, Ms. Cannon works with a committee to compile the results and fill out the required claim form. *Id.*

54. Ms. Cannon testified that the testing program which was included for reimbursement on the claim form was the standardized test of the Science Research Associates. *Id.* at 79.

55. Ms. Cannon stated that all of the quarterly logs received from the teachers and all of the reports dating back to the early 1980s are maintained in her office. *Id.* at 90. She noted that no one from the State or the legislative auditor's office had ever come to her school to review the supporting documents. *Id.* at 65.

56. Alvin Murphy, President of Archbishop Chapelle High School in Metairie, Louisiana, an all-girls high school operated under the auspices of the Archdiocese, indicated that his school participates in the nonpublic school required services reimbursement program. Doc. 254, pp. 5, 32.

57. Mr. Murphy testified that for the seven years that he has been principal and president of Archbishop Chapelle, no one from the State, the parish, the legislative auditor's office, or the Office of Education of the Archdiocese has ever visited the school to review the supporting documents. *Id.* at 41–43.

58. The Archdiocese receives the reimbursement funds from the State and then forwards the reimbursement funds to the individual schools. Once Mr. Murphy receives the funds, he deposits them into the general account of the school. *Id.* at 46.

59. Andrew Campbell, principal of St. Angela Merici School in Metairie, Louisiana, testified that his school participates in the required services reimbursement program. Doc. 251, pp. 4–5, 56.

60. The reimbursement funds received from the State were deposited into the general account of St. Angela Merici School. *Id.* at 57.

61. No one from the State or the Archdiocese has ever come to St. Angela Merici to review or audit the records substantiating the hours submitted on the claim forms. *Id.* at 61.

62. Thomas Becker, the principal of St. Agnes School in Jefferson, Louisiana, testified that St. Agnes participates in the nonpublic school reimbursement program. Doc. 252, pp. 16–17.

63. No one from the State Department of Education or the Archdiocese has ever visited St. Agnes to review the documentation supporting the claim forms submitted by the school. *Id.* at 21.

64. Mr. Cleveland has been involved in administering the reimbursement program since 1980 when the program started. Doc. 265, pp. 70–71. He testified that there is "no audit staff in the Department of Education . . . [and] one auditor for over a $2,000,400,000 budget." *Id.* at 99. The reason why no audit had taken place was because of "[l]ack of staff." *Id.*

65. Although La.Rev.Stat.Ann. § 17:365 and BESE Regulation § 5(a) authorize an audit of vouchers or other documents by the Superintendent of Education, the Court finds that no such audit by the Superintendent of Education has ever taken place.

66. Joseph Burris, the State Legislative Auditor at the time of his deposition on June 22, 1989, who had served in that capacity for seventeen years, testified that none of his staff auditors had engaged in any auditing at the site of any of the nonpublic schools in the state during the five years preceding his deposition. Burris dep., p. 11.

67. Although La.Rev.Stat.Ann. § 17:365 and BESE Regulation § 5(b) make provisions for an audit by the legislative auditor, the Court finds that no audit of the accounts and records of the nonpublic schools has been conducted by the State Legislative Auditor since at least 1984.

68. The Court finds that the principals of the nonpublic schools generally verified the accuracy of the reimbursement claim forms themselves.

*CONCLUSIONS OF LAW*

1. The United States Supreme Court has had two required services programs before it for its review: *Levitt v. Committee for Public Education,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), and *Committee for Public Education & Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980). In *Levitt,* the Court held unconstitutional the statute under review. In *Regan,* the Court held the statute to be constitutional.

2. In *Levitt,* the New York statute under review reimbursed nonpublic schools

> for expenses of services for examination and inspection in connection with administration, grading and the compiling and reporting of the results of tests and examinations, maintenance of records of pupil enrollment and reporting thereon, maintenance of pupil health records, recording of personnel qualifications and characteristics and the preparation and submission to the state of various other reports as provided for or required by law or regulation.

413 U.S. at 474, 93 S.Ct. at 2816.

3. In *Levitt,* the nonpublic schools were reimbursed for both state-prepared examinations and traditional teacher prepared tests. *Id.* at 475, 93 S.Ct. at 2816. The greatest portion of the funds paid the nonpublic schools under the statute was for reimbursement for the testing of the students. *Id.* at 478, 93 S.Ct. at 2818.

4. The *Levitt* Court found significant that no attempt was made under the statute and no means were available "to assure that internally prepared tests are free of religious instruction." *Id.* at 480, 93 S.Ct. at 2819. Since the State failed to assure that the testing was "not being used for religious indoctrination," the Court concluded that the reimbursement statute constituted "an impermissible aid to religion...." *Id.* This was so "because the aid that will be devoted to secular functions is not identifiable and separable from aid to sectarian activities." *Id.*

5. The *Levitt* Court noted that the State is not permitted to reimburse nonpublic schools "for any activity 'mandated' by state law or regulation." *Id.* at 481, 93 S.Ct. at 2819. Rather, "[t]he essential inquiry in each case, as expressed in our prior decisions, is whether the challenged state aid has the primary purpose or effect of advancing religion or religious education or whether it leads to excessive entanglement by the State in the affairs of the religious institution." *Id.* The Establishment Clause is not to be "read as permitting a State to pay for whatever it requires a private school to do." *Id.* at 482, 93 S.Ct. at 2820.

6. Thus, in *Levitt,* "the inherent teacher discretion in devising, presenting and grading traditional tests, together with the failure of the legislature to provide for a method of auditing to ensure that public funds would be spent exclusively on secular services, disabled the enactment from withstanding constitutional scrutiny." *Regan,* 444 U.S. at 650, 100 S.Ct. at 844–45.

7. In *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the Supreme Court sustained an Ohio statute which authorized the expenditure of state funds "[t]o supply for use by pupils attending nonpublic schools within the district such standardized tests and scoring services as are in use in the public schools of the state." *Regan,* 444 U.S. at 653, 100 S.Ct. at 846. In *Wolman,* the tests were drafted and graded by state personnel, and were administered by nonpublic school personnel. *Wolman,* 433 U.S. at 239, 97 S.Ct. at 2601. The Ohio statute did not authorize any reimbursement to nonpublic schools for the costs of administering the tests. *Id.*

8. The New York legislature enacted a new reimbursement statute after *Levitt.* The *Regan* Court upheld this new statute which permitted reimbursement to the nonpublic schools for two categories of services: the administration of state-prepared standardized examinations and the execution of state-required reporting requirements. *Committee for Public Education & Religious Liberty v. Levitt,* 461 F.Supp. 1123, 1125

(S.D.N.Y.1978), *aff'd sub nom., Committee for Public Education & Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980).

9. The New York statute considered in *Regan* provided reimbursement to the nonpublic schools both for administering standardized tests and for grading the tests. 444 U.S. at 657, 100 S.Ct. at 848. The statute did not reimburse nonpublic schools for "the preparation, administration, or grading of teacher-prepared tests." *Id.* at 652, 100 S.Ct. at 845–46. The Supreme Court in *Regan* applied *Wolman* and took it one step further, allowing the nonpublic schools to be reimbursed for both the costs of administering "secular" tests and grading of "secular" tests. *Id.* The *Regan* Court found that "grading the secular tests furnished by the State in this case is a function that has a secular purpose and primarily a secular effect." *Id.* However, the Supreme Court left open the possibility that "the outcome would likely be different were there no effective means for insuring that the cash reimbursements would cover only secular services." *Regan,* 444 U.S. at 659, 100 S.Ct. at 849.

10. The *Regan* Court also found that reimbursement for recordkeeping and reporting services had primarily a secular purpose. 444 U.S. at 656–57, 100 S.Ct. at 848. Between 85% and 95% of the total reimbursement to the nonpublic schools was for attendance reporting. *Id.* at 657 n. 5, 100 S.Ct. at 848 n. 5. The Supreme Court found that these ministerial "tasks are not part of the teaching process and cannot 'be used to foster an ideological outlook.'" *Id.* at 656–57, 100 S.Ct. at 848.

11. The statute in *Regan* required the schools claiming reimbursement to submit along with their application for reimbursement "additional reports and documents prescribed by the Commissioner...." 444 U.S. at 659, 100 S.Ct. at 849. In fact, § 4 of the New York statute provides:

> § 4. Application
>
> Each school which seeks an apportionment pursuant to this act shall submit to the commissioner an application therefor, together with such additional reports and documents as the commissioner *may require,* at such times, in such form and containing such information as the commissioner may prescribe by regulation in order to carry out the purposes of this act.

N.Y. Unconsol. Law ch. 91–C § 4 (1993) (Emphasis added).

12. La.Rev.Stat. § 17:362 virtually tracks the language of § 4 of the New York statute and also requires the nonpublic schools to submit with their reimbursement application "such additional reports and documents as the superintendent *may require....*". (Emphasis added). La.Rev. Stat.Ann. § 17:362 (West 1982).

13. The Court finds that La.Rev.Stat. § 17:362, on its face, does not violate the Establishment Clause under the Supreme Court's holding in *Regan.*

14. La.Rev.Stat. § 17:363 entitled "Maintenance of records" is essentially indistinguishable from § 5 of the New York statute, also entitled "Maintenance of records." Both sections require that each nonpublic school maintain "a separate account or system of accounts for the expenses incurred" and preserve the accounts and records supporting their applications for reimbursement at the school "until the completion of such audit procedures." La.Rev.Stat.Ann. § 17:363 (West 1982); N.Y. Unconsol. Law ch. 91–C § 5 (1993).

15. The Court finds that neither *Levitt* nor *Regan* mandate that once the reimbursement funds are received from the State, that they have to be deposited into a separate bank account. Like the statute upheld in *Regan,* La.Rev.Stat. § 17:363 requires that separate records and accounts be maintained at the nonpublic schools substantiating the services to be reimbursed. 444 U.S. at 659, 100 S.Ct. at 849.

16. The Court finds that La.Rev.Stat. § 17:363, on its face, does not violate the Establishment Clause under the Supreme Court's holdings in *Levitt* and *Regan.*

17. Section 17:364 of the Louisiana statute entitled "Payment" and § 6 of the New York statute entitled "Payment" both require that no funds be paid to a nonpublic school until the application has been approved by

the superintendent in the Louisiana statute and by the commissioner in the New York statute. La.Rev.Stat.Ann. § 17:364 (West 1982); N.Y. Unconsol. Law ch. 91–C § 6 (1993).

18. The Court finds that La.Rev.Stat. § 17:364, on its face, does not violate the Establishment Clause under the Supreme Court's holding in *Regan.*

19. Section 17:365 of the Louisiana statute and § 7 of the New York statute both authorize auditing by two different state departments. The Louisiana statute provides for auditing by the Superintendent of Education and by the Legislative Auditor. The New York statute approves auditing by the State Commissioner of Education and by the State Department of Audit and Control. The procedure for auditing by the Louisiana superintendent, set forth in the first paragraph of § 17:365, is identical to the procedure for auditing by the New York commissioner, set forth in the first paragraph of § 7 of the New York statute.

The second paragraph of both sections, § 17:365 and § 7, both require that any excess monies discovered by audit be returned "immediately" to the State by the nonpublic school.

The only notable difference in the two sections is that the New York department of audit and control "*shall* from time to time examine" the accounts and records of the nonpublic school, while the Louisiana Legislative Auditor "*may* from time to time examine" those same accounts and records. The Court does not find this discretion in the duties of the Louisiana *Legislative Auditor,* pursuant to § 17:365 of the Louisiana statute, to have any constitutional significance, since the Louisiana *Superintendent of Education* is commanded by the statute to audit documents "as is necessary to insure that such payment is lawful and proper." La. Rev.Stat.Ann. § 17:365 (West 1982). The audit by the Superintendent of Education, if performed properly, should be sufficient on its own to make certain "that the cash reimbursements ... cover only secular services." *Regan,* 444 U.S. at 651, 100 S.Ct. at 845. If the auditing by the Superintendent of Education is done thoroughly, the audit by the

Legislative Auditor can be reserved for unusual situations which demand additional scrutiny.

Thus, the Court finds that § 17:365 of the Louisiana statute contains provisions both authorizing state audits of nonpublic school financial records and requiring the refund of excess reimbursement, two of the concerns highlighted in *Levitt,* 413 U.S. at 477, 93 S.Ct. at 2817.

20. The Court also finds that the Louisiana statute, like the New York statute in *Regan,* on its face, "suggests no excessive entanglement...." *Regan,* 444 U.S. at 660, 100 S.Ct. at 850. The Louisiana statute, like the New York statute upheld in *Regan,* allows for a reimbursement process which "is straightforward and susceptible to the routinization that characterizes most reimbursement schemes." *Id.* In both statutory schemes, separate books are required for the reimbursement and " '[t]he services for which the private schools would be reimbursed are discrete and clearly identifiable.' " *Id.* Thus, the Court follows the *Regan* court and finds that any auditing of the records of the nonpublic schools by the State will not result in excessive entanglement.

21. Thus, the Court finds that La.Rev. Stat. § 17:365, on its face, does not violate the Establishment Clause pursuant to *Levitt* and *Regan.*

22. The most notable difference between the Louisiana statute and the New York statute upheld in *Regan* is the number of nonpublic school expenses that are allowed to be reimbursed by the State. Specifically, Section 3 of the New York "Reimbursement of Nonpublic Schools for Expenses of State Programs" allows reimbursement to the nonpublic schools for the actual costs incurred "for providing services required by law to be rendered to the state in compliance with the requirements of the state's pupil evaluation program, the basic educational data system, regents examinations, the statewide evaluation plan, the uniform procedure for pupil attendance reporting, and other similar state prepared examinations and reporting proce-

dures." N.Y. Unconsol. Law ch. 91–c § 3 (1993).[8]

Section 17:361 allows reimbursement to the nonpublic school for providing school services, maintaining records, and completing and filing reports, which are required by the State or the local school board in 14 specific categories and a category which includes "any other education-related data which are now or hereafter shall be required of such nonpublic school by law, regulation or requirement of a state department, state agency, or local school board." La.Rev.Stat.Ann. § 17:361 (West 1982). These expenses appear to be "highly routinized" and so "costs of the services for a given size of class should vary little from school to school, thus enabling the State to check claims filed by private schools against records maintained by hundreds of public schools under State supervision." *Regan,* 444 U.S. at 660 n. 7, 100 S.Ct. at 850 n. 7.

23. Plaintiffs have failed to identify, and the Court is not aware of, any law, regulation or requirement of any Louisiana state department, state agency, or local school board that requires the preparation or ordering of materials used in religion classes or to teach religion to children enrolled in parochial schools.

24. Since the statute limits the reimbursable expenses to these 14 specific categories and only "education-related data" which is or will be mandated by the State or local school board, the Court finds that the listed reimbursable activities "are discrete and clearly identifiable." *Regan,* 444 U.S. at 660, 100 S.Ct. at 850.

25. The Court finds that La.Rev.Stat. § 17:361, on its face, does not violate the Establishment Clause pursuant to *Levitt* and *Regan.*

26. The Louisiana reimbursement statute, unlike the New York statute, does not include the legislative purpose in the language of the statute. However, the Court finds that the Louisiana statute also has the secular purpose of providing "educational opportunity of a quality which will prepare its citizens for the challenges of American life in the last decades of the twentieth century." N.Y. Unconsol. Law ch. 91–C § 1 (1993); *Regan,* 444 U.S. at 654, 100 S.Ct. at 847.

27. The Court finds that the Louisiana statute on its face provides only that the actual costs incurred by the approved schools for record-keeping and for providing required services may be reimbursed upon application to the State Superintendent of Education.

28. The Court finds that the auditing procedures and other safeguards included in the Louisiana statute do not involve excessive entanglement, just as the *Regan* court found that the New York statute did not suggest excessive entanglement on its face. *Regan,* 444 U.S. at 660, 100 S.Ct. at 580. The *Regan* court described the process of reimbursement:

> Schools which seek reimbursement must 'maintain a separate account or system of accounts for the expenses incurred in rendering' the reimbursable services, and they must submit to the N.Y. State Commissioner of Education an application for reimbursement with additional reports and documents prescribed by the Commissioner.... Reimbursable costs include proportionate shares of the teachers' salaries and fringe benefits attributable to administration of the examinations and reporting of State-required data on pupil attendance and performance, plus the cost of supplies and other contractual expenditures such as data processing services. Applications for reimbursement cannot be approved until the Commissioner audits vouchers or other documents submitted by the schools to substantiate their claims.... The Statute further provides that the State Department of Audit and Control shall from time to time inspect the accounts of recipient schools in order to verify the cost to the schools of rendering the reimbursable services. If the audit reveals that a school

8. Effective July 1, 1985, § 3 of the statute was amended also to allow reimbursement for the actual costs incurred by the nonpublic schools "in meeting the recording and reporting requirements of the state school immunization program." N.Y. Unconsol. Law ch. 91–C § 3(b) (1993).

has received an amount in excess of its actual costs, the excess must be returned to the State immediately.... (citations omitted)

444 U.S. at 659–60, 100 S.Ct. at 849–50 (quoting 461 F.Supp. at 1126 (quoting N.Y. Laws, ch. 507)).

29. Since the reimbursement process set forth in the Louisiana statute, like the New York statute, is "straightforward and susceptible to the routinization that characterizes most reimbursement schemes," the Court finds that on its face, the Louisiana statute does not suggest any excessive entanglement. *Regan,* 444 U.S. at 660, 100 S.Ct. at 850.

30. The Louisiana required services reimbursement statute, which declares that nonpublic schools may receive reimbursement only after state officials review and approve state-prescribed application forms submitted by the nonpublic schools, La.Rev.Stat.Ann. §§ 17:362, 364 (West 1982), and that nonpublic schools must maintain documents supporting their claims in a separate account and are subject to periodic audits by the state, *id.* §§ 17:363 & 365, on their face provide "effective means for insuring that the cash reimbursements would cover only secular services." *Regan,* 444 U.S. at 659, 100 S.Ct. at 849.

31. Because of the safeguards included in the Louisiana statutory scheme which should insure that only secular services are reimbursed, the Court finds that the absence of "an express limitation" on the use of the reimbursement funds for religious purposes does not establish that the Louisiana Reimbursement of Required Costs statute on its face has the primary effect of advancing religion. *Bowen v. Kendrick,* 487 U.S. 589, 615, 108 S.Ct. 2562, 2577–78, 101 L.Ed.2d 520 (1988). The *Bowen* Court noted that the Supreme Court has "never stated that a *statutory* restriction is constitutionally required." *Id.* at 614, 108 S.Ct. at 2577.

32. The *Regan* Court noted that the Supreme Court has not accepted the "freeing-up" argument advanced by the plaintiffs: " 'that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.' " *Regan,* 444 U.S. at 658, 100 S.Ct. at 849 (quoting *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973)). In *Roemer v. Maryland Public Works Bd.,* 426 U.S. 736, 747 (1976), *quoted in, Regan,* 444 U.S. at 658 n. 6, 100 S.Ct. at 849 n. 6, the Court stated:

> The Court has not been blind to the fact that in aiding a religious institution to perform a secular task, the State frees the institution's resources to be put to sectarian ends. If this were impermissible, however, a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair. The Court never has held that religious activities must be discriminated against in this way.

33. The Court thus finds that the Louisiana statute, La.Rev.Stat. §§ 17:361–365, is constitutional on its face.

■ 34. Turning to the as-applied challenge, the plaintiffs contend that the reimbursement program's current set-up does not ensure that only state prepared tests and not teacher prepared tests are included, that the reimbursement funds will be used only for secular services, and that only the "actual costs" in the meeting of state obligations are reimbursed. Plaintiffs argue that either the aid will result in the advancement of religion because of the failure to adequately monitor its use, or due to the necessary monitoring, excessive entanglement will result.

35. Plaintiffs emphasize that the New York reimbursement plan in *Regan* involved tests that were prepared by the State, and were administered on the premises by personnel of nonpublic schools. 444 U.S. at 654, 100 S.Ct. at 846–47. The nonpublic schools were found by the Court to have no control over the content of the tests. *Id.* Although some of the state prepared tests were graded by nonpublic school personnel, it was determined that in view of the nature of the tests, which dealt only with secular academic matters, the grading by nonpublic school employees afforded no control by the nonpublic school over the outcome of any of the tests, leaving no risk that the state prepared tests could be used for religious educational purposes. *Id.* at 657, 100 S.Ct. at 848.

36. In *Zobrest v. Catalina Foothills School District,* — U.S. —, —, 113 S.Ct. 2462, 2463, 125 L.Ed.2d 1 (1993), the Supreme Court held that the school district's provision of a sign-language interpreter to a disabled child enrolled in a pervasively sectarian school to facilitate his education did not violate the Establishment Clause. The Court found that "[w]hen the government offers a neutral service on the premises of a sectarian school as part of a general program that 'is in no way skewed towards religion,'" providing this service does not offend the Establishment Clause. *Id.* — U.S. at —, 113 S.Ct. at 2467.

37. The Court finds that the administration of the Louisiana required services statute by the Louisiana Department of Education does not provide adequate assurance "that the cash reimbursements would cover only secular services." *Regan,* 444 U.S. at 659, 100 S.Ct. at 849.

38. The Court finds that the Louisiana Superintendent of Education and the Board of Secondary and Elementary Education are not administering the reimbursement program as set forth in La.Rev.Stat. §§ 17:361–365 for the following reasons: the Superintendent of Education and the Legislative Auditor have failed to conduct an audit of the documents and accounts of the nonpublic schools within the last five years; the Superintendent of Education has failed to check the claim forms for substantive content, rather than just checking the forms for mathematical accuracy; the Superintendent of Education has failed to require the nonpublic schools to submit additional reports and documents to support applications for reimbursement which exceed the parameters; the BESE regulations have failed to define "parameters" and to implement a procedure to be used to determine whether an expense falls within the acceptable parameters; and the BESE regulations have failed to limit reimbursement specifically to state-prepared tests and not teacher-prepared tests. The safeguards set forth in La.Rev.Stat. §§ 17:361–365 to ensure that the reimbursement to the nonpublic schools is only for secular services have not been implemented. According to *Levitt* and *Regan,* this Court must be certain that the reimbursement provided by the State does not directly aid religious education, and that the reimbursement is for tasks that have "a secular purpose and primarily a secular effect." *Regan,* 444 U.S. at 657, 100 S.Ct. at 848.

39. The Court thus finds that the Louisiana Reimbursement of Required Costs statute, La.Rev.Stat.Ann. §§ 17:361–365, as presently applied by the Louisiana Superintendent of Education and the Board of Elementary and Secondary Education, violates the Establishment Clause.

## *III. THE JEFFERSON PARISH SCHOOL BOARD'S BUS TRANSPORTATION PROGRAM*

### *A. WHETHER THE TRANSPORTATION PROGRAM WHICH PROVIDES FOR SEPARATE TRANSPORTATION OF PUBLIC AND NONPUBLIC SCHOOL CHILDREN IN JEFFERSON PARISH IS UNCONSTITUTIONAL IN ITS APPLICATION.*

### *B. WHETHER THE TRANSPORTATION PROGRAM RESULTS IN EXCESSIVE ENTANGLEMENT.*

### *FINDINGS OF FACT*

1. Plaintiffs challenge the State of Louisiana's school transportation statute, La.Rev. Stat. § 17:158, as applied in Jefferson Parish, Louisiana.

2. La.Rev.Stat. § 17:158 now provides, in pertinent part:

> A. (1) [E]ach parish and city school board shall provide *free* transportation for any student attending a school of suitable grade approved by the State Board of Elementary and Secondary Education within the jurisdictional boundaries of the parish or school board if the student resides more than one mile from such school.
>
> . . . . .
>
> (4) ... However, nothing in this Section shall prohibit a parish or city school from entering into contracts or mutual agreements for providing school bus transportation.

La.Rev.Stat.Ann. § 17:158 (West Supp.1994) (Emphasis added).

3. The statute applies to all "eligible public and nonpublic school students." La.Rev. Stat.Ann. § 17:158(F) (West 1982).

4. Act 1992, No. 24, entitled "Schools—Free Transportation for Students," became effective May 25, 1992. The purpose of this Act was:

> to amend and reenact R.S. 17:158(A)(1) and (C) and to enact R.S. 17:158(H), relative to school transportation; to provide for the *free* transportation of certain students living more than one mile from school; to provide for exceptions; to provide limitations; to provide for the duties and responsibilities of the state superintendent of education and the State Board of Elementary and Secondary Education; to provide for the duties and responsibilities of city and parish school boards and certain board officers and employees; and to provide for related matters.

1992 La.Sess.Law Serv. Act No. 24 (West 1992) (Emphasis added).

5. La.Rev.Stat. § 17:158 was amended after the trial of this matter. At the time of trial, the statute only required the local school board to provide transportation to all eligible public and nonpublic school students. In 1992, the statute was amended to require that the local school board provide *free* transportation to all public and nonpublic school students.

6. The Court finds that § 17:158(A), as amended, now mandates that *no* fee can be charged to any eligible student, public or nonpublic school, for transportation by the local school board. This is a significant change from the language of the statute which was applicable at the time of the trial.

7. La.Rev.Stat. § 17:158(H)(1) provides that "[n]o parish or city school board shall eliminate or reduce the level of transportation services provided to students as required by the provisions of this Section except for economically justifiable reasons approved in accordance with the provisions of this Subsection by the State Board of Elementary and Secondary Education." La. Rev.Stat.Ann. § 17:158(H)(1) (West Supp. 1994).

8. If the local school board claims that it has "economically justifiable reasons" to eliminate or reduce the level of transportation services to students, then the local school board has to submit detailed financial information to the State in support of its request. La.Rev.Stat.Ann. § 17:158(H)(2)(a)–(e). In addition, the chief transportation officer of the school system, the local superintendent of schools, and the presiding officer of the school board must attest to a written statement "that the proposed reduction in or elimination of transportation services to students does not have a disparate impact on any group of students by reason of race, creed, sex, handicap, residence, or school attended, *whether public or approved nonpublic, elementary or secondary.*" La.Rev.Stat.Ann. § 17:158(H)(2)(f) (Emphasis added).

9. The Court finds that § 17:158(H), a subsection added in 1992, requires that any reduction or elimination of transportation services by the local school board must apply equally to both public and nonpublic school students, elementary and high school students. There can be no "disparate impact" on one group when transportation services must be reduced or eliminated because of financial problems. *Id.*

10. The Court finds that § 17:158(H) sets forth detailed guidelines for the local school board to follow if the local school board seeks to reduce or eliminate transportation services. The State Board of Elementary and Secondary Education will review and consider any request by a local school board for approval to reduce or eliminate transportation services that is in compliance with the requirements of § 17:158(H), "however no such approval shall be granted by the Board until the State Superintendent of Education has certified the accuracy and validity of the information submitted by the parish or city school board." La.Rev.Stat.Ann. § 17:158(H)(3). The local school board must submit detailed information to the State, which the State will then certify for accuracy and validity, in order to receive permission to curtail services. It is obvious to the Court

that the intent of Subsection H is to ensure that the local school board has legitimate financial concerns when it recommends elimination or reduction in student transportation services.

11. Plaintiffs argue that the Jefferson Parish School Board has established and maintained a transportation system segregating students on bus routes according to the schools they attend, thus separating public from nonpublic school children. Plaintiffs contend that this practice violates the Establishment Clause of the First Amendment as made applicable to the states by the Fourteenth Amendment, as well as by reason of the equal protection requirements of the Fourteenth Amendment.

12. Plaintiffs claim that the Jefferson Parish School Board has not made a good faith attempt to maximize the number of bus routes where both public and nonpublic school students are jointly served on the same buses in keeping with the safe, efficient and economical operation of the School Board's transportation program.

13. Plaintiffs also maintain that the Archbishop of New Orleans and other administrators and staff of Catholic schools located within Jefferson Parish have been directly involved in the establishment of the transportation program for public and nonpublic school students from the 1985–86 school year through the 1989–90 school year.

14. The Jefferson Parish School Board (JPSB) is a political subdivision of the State of Louisiana that is vested with the authority to direct the operations of the Jefferson Parish Public School System (JPPSS), subject to the rules and regulations promulgated by the Board of Elementary and Secondary Education (BESE). Doc. 336, p. 69, Stip. Fact 18.

15. During the 1989–90 school year, the JPPSS transported approximately 41,862 students by school bus, of which 35,715 were public school students and 6,147 were nonpublic school students. Doc. 277, p. 93.

16. The 1989–90 school bus ridership for the Jefferson Parish Schools was 85.6% public school students, 12.4% Catholic in-district students, 1.4% Catholic out-of-district students, and .5% Lutheran students. Ex. D–47.

17. The geographic boundaries of the Jefferson Parish Public School System are contiguous with those of Jefferson Parish. Doc. 267, p. 80.

18. Jefferson Parish is twelve miles wide. Doc. 264, p. 46.

19. To be eligible for JPPSS transportation, both public and nonpublic school students must be bona fide residents of Jefferson Parish, must attend a state-approved school located within Jefferson Parish, and must reside more than one mile from their school. Exs. S–18, p. 21; S–19, p. 21; P–334.

20. The JPPSS does not transport any nonpublic school students outside of Jefferson Parish. Nor does the JPPSS transport any public school students outside of Jefferson Parish, except for certain special education students living in Grand Isle. Doc. 267, p. 80.

21. The transportation area is the geographic area "within which transportation service is provided to specific schools." Doc. 276, p. 36. The attendance area includes "the transportation area plus any pedestrian walk zones and/or any areas that [the JPPSS does] not provide transportation from to a specific school." *Id.*

22. George F. Horne is the Assistant Superintendent for Planning and Transportation of the Jefferson Parish Public School System. Doc. 262, p. 93. He has held that position since January 1987. *Id.* In that capacity, he has been principally responsible for establishing school attendance districts and for overseeing the operation of the JPPSS bus transportation system. *Id.* Approximately sixty percent of his time is spent administering the transportation system and forty percent of his time is spent in the planning department. *Id.* at 87.

23. Mr. Horne is certified to teach fleet motor vehicle courses and the National School Bus Transportation course. Doc. 273, p. 99. He is a member of the National Association of Pupil Transportation, and is a member and past president of the Louisiana Association for School Transportation Offi-

cials. *Id.* He has also "served as a consultant to the Tangipahoa Parish school system in matters related to bus routing, time schedules." *Id.* at 100. He has also served as an expert witness in state court on matters related to "transportation safety and routing buses." *Id.*

24. The Court finds that Mr. Horne has considerable experience in the field of school bus transportation.

25. Two editions of the "Procedure Manual for the Division of Planning and Transportation of the Jefferson Parish Public School System" were applicable effective with the 1988–89 school session. Ex. S–18, p. iii. The First Edition which was revised in August 1988 (Ex. S–18) (hereinafter "First Edition") was to be used by the *public* schools. The Second Edition which was revised in August 1988 (Ex. S–19) (hereinafter "Second Edition") was to be used "by *non-public* schools receiving transportation services through the public school system and non-public schools receiving special education teachers and assistants." Ex. S–18, p. iii. (Emphasis added).

26. According to the Foreword of the First Edition, the responsibilities of the JPPSS Transportation Department (hereinafter "Transportation Department") are "to seek and train responsible individuals to serve as full-time and substitute drivers and as special education bus attendants, to develop school time schedules and to design school bus routes for transporting safely more than 50,000 students twice a day." *Id.*

27. JPPSS transportation of students attending nonpublic schools located in Jefferson Parish is governed by the "Nonpublic School Transportation Policy," adopted by the Jefferson Parish School Board, revised on June 1, 1989, and set forth in the Second Edition. Ex. S–19, pp. 21–23.

28. The JPPSS establishes the transportation schedules and starting and ending time schedules for all public and nonpublic schools located in Jefferson Parish that have students who receive transportation services from the JPPSS. Doc. 336, p. 69, Stip. Fact 21; Ex. S–19, p. 21.

29. All of the Catholic schools in Jefferson Parish operated by the Archdiocese of New Orleans participate in the transportation program provided by the Jefferson Parish School Board. Doc. 264, pp. 83–84. The Jefferson Parish School Board sets the starting times for all of the Archdiocesan schools in Jefferson Parish. *Id.* at 84; *see* Ex. S–23.

30. The JPPSS generally designs its school bus routes to be "unique" routes—*i.e.*, each bus route services a single school. Doc. 261, p. 34. The JPPSS assigns one school per bus for both public and nonpublic schools. Doc. 267, p. 84. There are "virtually no instances" where two schools are serviced on the same route, "whether it was two public schools serviced on a route, two Catholic schools serviced on a route or public and a Catholic school serviced on a route." Doc. 261, p. 34.

31. This policy of unique routes applies to all school bus routes operated on behalf of the JPPSS, regardless of whether the students served attend a public school or a nonpublic school. Doc. 267, p. 84.

32. Mr. Horne testified that "it is administratively easier if we have fleets of buses assigned to these various schools so that we reduce the number of buses serving them." *Id.* at 85. Some of the reasons Mr. Horne presented to support the practice of one school per bus were: time coordination, distance between schools, different lengths of school days, waiting time of students for the buses, flexibility in assignments, less cost, and more efficiency. *Id.* at 85–86.

33. The Jefferson Parish School Board's policies governing student transportation permit JPPSS transportation planners to employ "combination routes"—*i.e.*, routes that simultaneously transport public school students and nonpublic school students to their schools—where this is economically and logistically feasible. *Id.* at 35–37, 100–03.

34. A combination route services several different locations or individuals on the same bus. Doc. 269, pp. 33–34. It is a route "in which students from more than one school can be drawn to a single bus and that single bus would drop off those students at each of those two schools." *Id.* at 124.

35. Combination routes are those routes upon which students who attend different schools are transported on the same bus at the same time. Doc. 336, p. 70, Stip. Fact 26.

36. The 1985 edition of "Standards for School Buses and Operations," the "Bible for transportation," does not specifically refer to combination routes. Ex. P–784; Doc. 274, p. 84.

37. The JPPSS has not "historically" attempted to combine routes to the extent possible. Mr. Horne testified:

> We to the extent possible have not combined the routes. When it is judicious to do so, in our opinion, because of having extra space and students needing transportation and we can't justify having an additional bus, then we do but as a matter of principle trying simply to combine routes we feel that there are some other overriding concerns that we need to address.

Doc. 267, p. 96.

38. Dr. Russell Protti, the former Superintendent of Schools, Jefferson Parish Public School System, testified that there has been no attempt by the JPPSS to have public and nonpublic school children riding on the same bus. Doc. 262, p. 72.

39. The factors that the JPPSS would consider before combining public and nonpublic students on the same bus are: the cost, "the length of time the students ride the bus, how long they have to be on the campus before and after school, what time frames are available for us to transport them and whether or not additional buses would be required." Doc. 267, pp. 105–06.

40. The Transportation Department has never conducted a study to determine whether combination routes of public and nonpublic schools that are in close proximity would increase the operational costs and the number of buses traveling to those schools. *Id.* at 107.

41. Plaintiffs' expert, George Donn, has been the Director of Transportation for the Washington County Board of Education in Hagerstown, Maryland since 1975. Doc. 269, p. 4. He also served as the Assistant Supervisor of Transportation for the Prince George's County public school system from 1965 to 1973. *Id.* at 5. Mr. Donn has been a member of the National Association for Pupil Transportation since 1975 and has served as its president. *Id.* at 7–8.

42. The Court finds that Mr. Donn is well qualified to testify as an expert with respect to student bus transportation generally and the feasibility of combination routes in Jefferson Parish.

43. Steven Rittvo, the president of Urban Systems Associates, Inc., is a transportation engineer and planner. Doc. 276, pp. 43–44. His company is the traffic and transportation engineer for the Orleans Parish School Board. *Id.* at 50. Although the Court was impressed with Mr. Rittvo's experience in the transportation field, the Court notes that Mr. Rittvo's experience is not directly related to the scheduling and routing of school buses. *Id.* at 54.

44. Mr. Donn testified that combination routes can be designed either to increase or to decrease riding time, depending on the objectives of the Transportation Department. Doc. 277, p. 56. The service area for each bus can be decreased and the distance reduced by dividing up the geographical area for each bus and serving two schools. *Id.* at 62. For a combination route, "each bus only has to cover half of the area to get its capacity." *Id.* at 63. Mr. Donn testified that this approach should reduce both time and mileage, while increasing the ridership of the bus. *Id.* at 62–63.

45. Mr. Donn analyzed two major factors to determine whether a combination route is feasible: comparable geographical attendance areas and close proximity of the schools. Doc. 269, pp. 37–38, 57. Close proximity between schools is different in each case; there is no uniform definition of close proximity. *Id.* at 123.

46. Mr. Donn testified that in most instances combination runs decrease the number of buses used because more children are served and so there is usually better utilization of the equipment. Doc. 269, pp. 39–40. He also stated that combination runs "sometimes reduce[ ] the time because the time the bus is going to cover in a geographical area

is going to be less than trying to duplicate the whole area...." *Id.* at 40.

47. One of the reasons presented by Mr. Horne for not implementing combination routes in Jefferson Parish was the potential for discipline problems because of sports rivalries between different schools. Doc. 273, pp. 111–112. Administrative problems could result in "the handling of the discipline procedure with the administrations of two separate schools...." *Id.* at 112.

48. A principal requested that a combination route in Jefferson Parish between a public school and a nonpublic school be eliminated because of "the behavior of the students and the subsequent administration of the discipline policy with regard to those problems." Doc. 276, p. 39. The JPPSS did not conduct an independent investigation of the problem. *Id.* at 39–40.

49. Mr. Donn testified that to handle discipline problems on school buses, many transportation systems have implemented "some type of standardization of discipline relative to what is expected of students and ... try to keep it as simple as possible and that is for the youngsters to get on the bus, take their seat, face forward and talk in a conversational tone." Doc. 277, p. 54. To handle discipline problems involving children from different schools, Mr. Donn testified that it is necessary to work with the school administrators and if needed, schedule "joint parent conferences in some instances." *Id.* Each situation has to be analyzed on its own merits. *Id.*

50. A "Bus Student Discipline Procedure" is already set forth in both the First Edition and the Second Edition of the "Procedure Manual for the Division of Planning and Transportation of the Jefferson Parish Public School System." Ex. S–18, pp. 52–55; Ex. S–19, pp. 15–18. These discipline procedures apply to both public and nonpublic school students. The Court agrees with Mr. Donn that a workable procedure could be implemented by the JPPSS to address any possible discipline problems involving bus riders from different schools.

51. Mr. Donn testified that in his county he serves the elementary schools "as individual schools separately ... [and puts] the middle and high school students on the same bus." Doc. 269, p. 34. When a fifth grade or a middle school is located in close proximity to an elementary school consisting of kindergarten through fourth grade, the bus will drop off the students at the elementary schools and "then go down the street and ... drop off the fifth grade." *Id.* If the elementary school is not in close proximity to the middle school, Mr. Donn would "move the fifth grade onto the middle school bus and serve it in that capacity." *Id.* at 35.

52. Mr. Donn does not combine elementary and high school students on the same bus in his school district, except for special education students. *Id.* at 110.

53. Capacity in the school bus industry is based on "rump room." *Id.* at 49. There are "three-three" seats which allow three persons on each side "thirteen-inch rump room," and there are "three-two seats" which allow two persons on one side fifteen inches of rump room and three persons on the other side fifteen inches of rump room. *Id.* The "three-three" seating is used more in the elementary schools, and the "three-two" seating is used more for high school students. *Id.* The Court finds that more elementary school students can be seated on a school bus than high school students because of the difference in "rump room." *Id.* at 49–50.

54. Mr. Donn testified that on a 66 passenger bus, he would normally attempt to have a minimum of 50 elementary school students as passengers. *Id.* at 50–51. For high school students, the minimum is approximately 44 passengers on a 66 passenger bus. *Id.* at 51. The number of middle school passengers on a bus depends on whether the students are in the fifth grade or upper grades. *Id.*

55. On a sixty-six passenger bus, no more than sixty-six students, excluding high school students, "could be appropriately accommodated." Doc. 276, p. 156. As to the number of high school students on a sixty-six passenger bus, Mr. Rittvo "would be comfortable with forty-four although at times [he has] seen it go higher than that." *Id.*

56. The policy of the Transportation Department of the JPPSS is to have a minimum of forty students attending the *nonpublic* schools per bus route. This applies to both elementary and high schools. Doc. 267, p. 94; Ex. S–19, p. 22. This policy statement does *not* apply to the public schools. Doc. 267, p. 94.

57. Neither the State of Louisiana nor the JPPSS has any policy that permits or authorizes the segregation of school children on publicly funded school buses on the basis of religion or race.

58. JPPSS Department of Transportation personnel do not seek or obtain any information concerning the religion of the children transported on JPPSS, and the religion of the students is "never" taken into account by the JPPSS in designing the bus routes or assigning the bus routes. *Id.* at 84.

59. Whether the school is public or nonpublic is not a factor in the assignment of bus drivers. Drivers employed by the JPPSS may transport students attending a public school on one of their routes, and then transport students attending a nonpublic school on another route, or vice-versa. Doc. 336, pp. 69–70, Stip. Fact 25; Doc. 266, pp. 75–76.

60. Non–Catholic students are enrolled in Catholic elementary and high schools located in Jefferson Parish, and non-Catholic teachers teach in Catholic elementary and high schools located in Jefferson Parish. Ex. S–34, p. 2.

61. The vast majority of the approximately 7,000 Catholic school-age children residing in Jefferson Parish who were not enrolled in Catholic elementary or high schools from 1985 to 1990 attended Jefferson Parish public schools, and some of those Catholic children were transported to their public schools on Jefferson Parish school buses. *Id.* at 1.

62. The testimony of an administrator of a Catholic high school located within Jefferson Parish was that he had no objection to his students being transported on the same bus with public school students. Doc. 254, pp. 26–27. It was his opinion that the establishment of such combination routes would be a good arrangement. *Id.* at 28. His opinion was "based on the fact that if this can provide greater service to the students and to the parents in going to and from school that it would be good. It would eliminate traffic in Jefferson Parish. It would eliminate the possibility of accidents before and after school. It would increase the safety factor throughout. It would accommodate parents of all school children...." *Id.*

63. The Transportation Department considers the following factors in arranging the routing and scheduling of the school buses for the school year:

> Length of school day, numbers of students to be transported, where the students live, student density, the time schedule of the school beginning and ending, the grade organization of the school, the traffic conditions on the way to and from school, the postschool activities that may be required at the schools, that is, extracurricular activities, athletics and so forth for the schools, the types of facilities that are available for those purposes at the schools ... Distance and time is [sic] used in the assignment of routes and drivers, not in the development of routes for specific schools.

Doc. 266, p. 69.

64. The bus driver establishes the route that he is going to travel taking into consideration the state guideline "that unless there is a safety factor that would dictate otherwise they are supposed to begin from the fartherest [sic] distance from the school picking the students up and proceed on in safely to the school." Doc. 267, p. 110–11. The Transportation Department then reviews the route and makes any necessary changes. *Id.* at 111.

65. Since Mr. Horne has been involved in transportation at the Jefferson Parish Public School System, the Transportation Department has never attempted "to basically throw out the past routing arrangement and start from scratch to ... come up with a more efficient arrangement." Doc. 275, p. 27.

66. The routing and scheduling of school buses are guided by three concepts: safety, efficiency, and economy. Doc. 269, pp. 30, 119. Safety is more important than efficiency and economy. *Id.* at 122.

67. School buses are "the safest form of motor transportation on the road today." *Id.* at 53.

68. After safety, efficiency, and economy, other important factors are the number of students to be transported and the location of the schools. *Id.* at 120.

69. The policy of the Jefferson Parish School Board is "that no bus route is to be longer than an hour and a half and that it is desirable that special ed. children on the bus are an hour or less." Doc. 276, p. 145.

70. The average bus route in Jefferson Parish, excluding the special education bus routes, is "in the twenty-five to thirty-minute range." *Id.* However, "some are exceedingly long and some are significantly shorter...." *Id.*

71. Special education students comprise approximately 4% of the total ridership on the buses. *Id.* at 28.

72. JPPSS has staggered the starting times of schools located within the district since at least 1975. Doc. 336, p. 69, Stip. Fact 22.

73. Staggering starting times involves placing different schools at different starting times in order to allow a bus to serve more than one group of children. Doc. 269, pp. 31–32.

74. Staggering the starting times for schools "has become almost a universal[ly] acceptable way of handling" a transportation program. *Id.* at 32. They are used widely in the pupil transportation industry. *Id.*

75. The purpose of staggering school starting times is to enable the JPPSS to assign multiple bus trips, or "routes," to school bus drivers. Doc. 273, pp. 105–06. Such "multitripping" permits the Jefferson Parish Public School System to "transport more students, serve more schools with the same size fleet of buses." *Id.* at 106.

76. By multitripping the JPPSS is "able to keep the length of the ride time down" for most of the schools serviced. *Id.*

77. The use of multitripping reduces the fixed overhead expense of the transportation system because it reduces the number of bus drivers and buses that must be employed to transfer the students. *Id.* at 107–109.

78. Out of the 64 parishes and two city systems in Louisiana, Jefferson Parish has been "rated as either one, two, or three in the number of students per bus and the number of routes per bus and the cost per student," since approximately 1978 by the Louisiana Department of Education. Doc. 267, p. 86.

79. The Court finds that the Jefferson Parish Public School System's use of multitripping is an efficient, economical use of resources for the transportation program.

80. During the 1989–90 school year, JPPSS employed 326 bus drivers who drove approximately 1,150 bus routes. Doc. 262, p. 88; Doc. 273, p. 105. Applying these figures, the Court finds that the average number of routes that most bus drivers drive is 3.52. The Court agrees with plaintiffs' expert, Mr. Donn, that this number of trips per driver is average "for the nature of the system." Doc. 277, pp. 36–37.

81. After reviewing the driver logs, Mr. Donn found that up to 304 bus routes had less than 26 passengers. Doc. 269, p. 77–78. Based on this information, Mr. Donn testified that there could be "better utilization" of the buses and that was "a relatively high number of trips to have that type of low ridership." *Id.* at 78. This underutilization of the buses has a financial impact on the school system. *Id.*

82. A platoon run is when a bus takes a group of students from a school and moves them directly to another school for a program. *Id.* at 33.

83. An "in-and-out route" is one where the bus driver drives in and out of the neighborhood so that the students are not required to walk more than the distance required by statute. Doc. 267, p. 123. "The driver might go down the street for five blocks, turn two blocks over and come back and weave his way around so that you would minimize the distance that the students had to walk to catch the bus." *Id.*

84. Transit type routing is when "the bus rolls down the street and anybody who lives

from one side or the other is required to come out and catch the bus. . . ." *Id.* at 124.

85. In transit type routing, the bus does not pick the students up at home. *Id.* at 87–88. The bus travels along "through-streets" and the students walk to the street to catch the bus "without regard to how far they have to walk to catch it." *Id.*

86. The JPPSS employs "transit type routing ... very extensively with the nonpublic high schools and to a lesser degree with nonpublic elementary schools." *Id.* at 88.

87. The First Edition states that for public school students, transit-type routing "is to be utilized where necessary to reduce per-student costs to an acceptable level. . . ." Ex. S–18, p. 48.

88. Even though transit type routing is approved for public school students in the First Edition, Mr. Horne testified that transit type routing is not used for the public schools. Doc. 267, p. 88. In-and-out routing is used for public school students.

89. Transit type routing is preferable to in-and-out routing "from a cost standpoint but from the standpoint of safety and providing better services to the riders it is not." *Id.* at 91.

90. Transit type routing is less safe than in-and-out routing but it is "not unsafe." *Id.* at 124.

91. In addition, the First Edition provides that for public school students, "[p]arents may be required to bring students to a designated centralized bus stop location ... Supervision of students at a central bus stop shall be the responsibility of parents or school personnel." Ex. S–18, p. 48.

92. Centralized bus stop locations are not used for public school students, even though they are used for nonpublic school students. Doc. 267, pp. 88–89. The parents supervise the nonpublic school students at the centralized bus stop locations. *Id.* at 18. They are not compensated for their services by the Jefferson Parish School Board. *Id.* at 90.

93. Shuttle runs are "an integral tool in the pupil transportation industry." Doc. 277, p. 67. The 1985 edition of "Standards for School Buses and Operations" provides for a shuttle route as a routing technique. Ex. P–784, p. 60. It states: "A shuttle route extends between two or more school buildings. Such routes are often required for the transfer of pupils in districts operating two or more schools." *Id.*

94. Mr. Donn defined a shuttle route as:

> A potential shuttle route would be a route whereby you would have youngsters of two or more schools on the same bus. It would then arrive at a particular school and there would be other buses bringing in youngsters that would attend another school. They would transfer and then one bus or two buses, depending upon your numbers, would go directly to the assignment school of those particular students versus a combination which I have indicated before where the bus would maybe visit both schools.

Doc. 270, p. 7.

95. The main benefit of a shuttle run is that a busload of children can be moved from Point A to Point B much faster than if the bus had to cover the entire geographical area to pick up the children. Doc. 277, pp. 65–66. Mr. Donn testified that "if you can use four or five buses to pick the youngsters up, which means that you cover the area by one fourth or one fifth, the ride time is decreased; then you use a shuttle between Point A and Point B which is going to be a lot less than trying to duplicate all four or five bus pick-up areas." *Id.* at 66. School administrators and teachers normally coordinate the transfers to the shuttles and so precautions are taken and safety problems are avoided. *Id.*

96. According to the Collective Bargaining Agreement, a teacher assigned to bus duty has to remain at the school "for as long as there are buses coming into the school." Doc. 276, p. 23.

97. The 1985 edition of "Standards for School Buses and Operations" states that it is "considered poor practice to negotiate a U-turn on main arteries of traffic even though provisions for such turns may have been made." Ex. P–784, p. 61. The reason given is that "[t]he projection of the rear end of the

bus into inside traffic lanes from medians that are too narrow to accommodate bus length often creates traffic interference that places the lives of transported pupils in jeopardy." *Id.* U-turns create a risk both to the passengers on the bus and to the public. Doc. 270, p. 64.

98. Mr. Donn testified that combination/shuttle routes should be created to avoid the bus having to make a U-turn. *Id.* at 65.

99. Mr. Donn testified that a public school route is generally more expensive than a nonpublic school route because of the additional expenses of complying with desegregation rulings and transporting special education students. Doc. 269, p. 82. In addition, transit type routes are generally more economical than in-and-out routes, and transit type routes are only used for nonpublic school students in Jefferson Parish. *Id.* at 80–81.

100. Approximately 150 nonpublic school routes were in operation in the 1989–90 school year in Jefferson Parish. Doc. 270, p. 70.

101. In Mr. Donn's opinion, the Jefferson Parish School Board has "not done as good a job as they could have" in utilizing their school buses. *Id.* at 84. Mr. Donn testified that the Jefferson Parish School Board has "the parameters to put together combination and shuttle runs and do a better job of integrating both public and nonpublic on the buses than what they are doing presently." *Id.* at 99.

102. It is Mr. Donn's opinion "that the Jefferson Parish public school system could integrate the bus service of public and nonpublic school children on many routes. With close proximity of some schools the same bus could transport both public and nonpublic pupils and stop at each school. Other situations the school system could use a shuttle bus between the public and nonpublic school." Doc. 269, pp. 59–60. Mr. Donn found that combination routes "decrease the number of buses repeating service within the same community and ... the cost of a shuttle run is far less than duplicating services." *Id.* at 60.

103. The Court finds that additional expenses are incurred by the Transportation Department of the JPPSS by operating buses on unique routes. Operating separate buses for each school appears to the Court to increase the mileage for the school bus drivers and thus the cost to the transportation system. In addition, the buses are usually not filled to capacity by using this approach to busing which results in additional expenses. The most cost effective approach appears to be combining routes of schools of similar grades that are in close proximity to each other, whether the schools are public and nonpublic. Usually this would entail combining public and nonpublic schools because they would more likely be located in the same transportation district. Even though combination routes appear to be more economical than unique routes, a paramount concern is the safety of the children on the bus. The evidence presented at trial convinces the Court that unique routes are usually safer than combination routes, especially for elementary school children.

104. JPPSS routes for both public and nonpublic school students are set to operate within "time windows." A "time window ... [is] the period of time at which the students can first be dropped off at a school up to the starting time" or picked up after the school closing time. Doc. 274, p. 63. The time windows are 30 minutes long, except for the last school drop-off on a morning multitrip route (which is 15 minutes long), and the first school pick-up on the afternoon multitrip route (which is 10 minutes long). *Id.;* Ex. S–18; Doc. 273, p. 104.

105. Jefferson Parish public high schools originally started classes at 7:00 a.m., when a shortage of space required JPPSS to hold two separate daily high school sessions to accommodate all of the students. The first session was "from 7:00 a.m. to approximately noon or maybe 12:15. Another group of students would come in at approximately 12:30 and stay until around 5:30 in the evening...." Doc. 267, pp. 26–27. This practice, known as "platooning," ended in 1976. *Id.*

106. When the "platooning" of the public high schools ended, the JPPSS "wanted to

change ... the early starting times." *Id.* at 27. However, the state Department of Education denied the request of the JPPSS for additional buses "because of the financial hardship the state was experiencing." *Id.* Thus, the Transportation Department maintained an early starting time for the public high schools and relied on its existing fleet of buses. *Id.* at 26–27.

107. The first substantial complaints about the early starting times for the public schools were received by the JPPSS prior to the 1985–86 school year. *Id.* at 28.

108. Because of these complaints, including complaints of plaintiff, Mary "Neva" Helms, on June 19, 1985, the Jefferson Parish School Board established the School Time Task Force (hereinafter "Task Force"). Ex. P–372. The Task Force was comprised of parochial school parents and principals; public school parents and principals; bus drivers; and the Transportation Department. *Id.* Plaintiffs, Mrs. Helms and Marie Schneider, were members of the Task Force. *Id.*

109. The goal of the Task Force was "[t]o develop a plan for establishing daily public and non-public school time schedules that provide for starting times later than 7:00 A.M. but not later than 9:00 A.M. and ending times not later than 3:30 P.M., with a tentative completion date of February 26, 1986." *Id.*

110. Since a consensus could not be reached on any issue, the Task Force elected to make 26 recommendations. *Id.* at 34. Each recommendation was voted upon and all of the recommendations were submitted to the Jefferson Parish School Board "because some members of the Task Force felt that if we didn't at least show the Board what was being discussed and what some groups felt that it really wouldn't be fair." *Id.*

111. By a vote of 25 "yes" to 7 "no" the Task Force recommended that all high schools start between 7:30 a.m. and 8:00 a.m. and all middle and junior high schools start between 7:30 and 8:15 a.m. Ex. P–372.

112. On March 5, 1986, Mr. Horne, the Task Force Chairman, reported to the Jefferson Parish School Board that "1985–86 high school, middle and junior high school time schedules *can* be moved to a later starting time. How much later depends on which recommendations are adopted, when they are adopted, how traffic may affect route times later in the mornings and afternoons, etc." Ex. P–324.

113. On March 19, 1986, the Jefferson Parish School Board recommended that *all* high schools and career centers start at 7:20 a.m. and *all* middle and junior high schools start at 7:30 a.m. Ex. P–446. Thus major changes were made in the 1986–87 school time schedule "in order not to start schools before 7:20 A.M. and not after 9:00 A.M." Ex. P–321.

114. At the time the recommendation was made, the public high schools had started classes at 7:00 a.m., with two exceptions, and the nonpublic high schools had started at "7:15, 8:00, 9:00, various times." Doc. 262, p. 108. After this recommendation was adopted by the Jefferson Parish School Board, all high schools and career centers started classes at 7:20 a.m., with two exceptions. *Id.* For the 1989–90 school year, one Catholic high school requested an earlier starting time of 7:15 a.m. which was permitted. *Id.*

115. The changes in the starting times for the high schools affected the starting times for the elementary schools because of the reduced "time window available to transport the students." Doc. 267, p. 55. Thus, for the 1986–87 school year, 40 elementary schools started classes at 9:00 a.m., as opposed to 25 schools starting classes at 9:00 a.m. for the 1985–86 school year. *Id.;* Ex. P–320.

116. The Task Force also considered combination routes. The members voted 14 "yes" and 17 "no" on the recommendation that all public and non-public *secondary schools* be considered together in assigning combination routes. Ex. P–372.

117. By a vote of 17 "yes" and 15 "no", the Task Force recommended that combination routes for public and nonpublic *high school* students be established "within the

district boundaries established in accordance with number 7 above." *Id.*

118. The seventh recommendation, for which 20 members of the Task Force voted "yes" and 12 voted "no", was that all schools be assigned districts and all out-of-district transportation be eliminated except as required for racial balance, special education, and English as a Second Language (E.S.L.). *Id.*

119. After considering the Task Force's recommendations, the Jefferson Parish School Board also recommended that the JPPSS "establish combination routes for public and nonpublic *high school* students if, after students are assigned to buses, there are too few students remaining to warrant adding another bus solely for one school." Ex. P–446.

120. The recommendation does not appear to have been implemented by the Transportation Department. On the east bank of Jefferson Parish, Mr. Horne testified that there are no combination routes or any other transit type routes for public and nonpublic high school students. Doc. 263, p. 47. On the west bank of Jefferson Parish, there are one or two combination routes involving Lincoln Career Center, a public school, and two of the nonpublic high schools. *Id.* at 44. There is also "combination transit type routing" for two nonpublic high schools on the west bank. *Id.* at 47.

121. The Court finds that there was no evidence presented at trial that any nonpublic high schools objected to the establishment of combination routes. In fact, the Court is persuaded that the nonpublic high schools would welcome the increase in service areas which should result if the Transportation Department implements the Jefferson Parish School Board recommendation of employing combination routes for the public and nonpublic high schools.

122. For the 1988–89 school year, there appear to be six non-special education routes where both public and nonpublic *elementary* school students were combined to ride on the same bus. *Id.* at 87; Ex. P–353.

123. Another recommendation by the JPSB was that all requests for new out-of-district routes be denied, "except special education, racial balance and E.S.L., and these types of routes must be approved and funded by the State." Ex. P–446. This recommendation was implemented by the Transportation Department. Doc. 262, p. 111.

124. The Jefferson Parish School Board also recommended that specific schools be assigned geographic areas for transportation purposes. Ex. P–446. The Transportation Department then implemented this recommendation for all Catholic elementary and high schools and all Lutheran schools. Doc. 262, p. 112.

125. The Second Edition defines a nonpublic school district as "a church parish, community, congregation, or other such designation of a geographic area, or a portion thereof, all located within the civil parish of Jefferson." Ex. S–19, pp. 22–23.

126. The transportation districts for the nonpublic elementary schools were the church parishes, with the exception of parishes without a school. For parishes without a school, a district was configured "that would be a close and tight-knit district" and that would include nonpublic schools in close proximity to those parishes. Doc. 264, pp. 33–34.

127. In Jefferson Parish, there is no Catholic elementary school located in 9 church parishes: Nativity of Our Lord Parish, St. Jerome Parish, St. Bonaventure Parish, St. Anthony (Barataria) Parish, Holy Guardian Angel Parish (Bridge City), St. Pius X Parish (Crown Point), Infant Jesus of Prague Parish, St. Martha Parish, and Our Lady of the Angels Parish. P–411 at p. 7; Doc. 263, pp. 147–50; Doc. 274, pp. 97–98.[9]

128. St. Jerome and Nativity of Our Lord are two neighboring church parishes without schools. Ex. S–34, p. 2. The transportation districts that were created for those parishes include five contiguous nonpublic schools, St. Philip Neri, St. Lawrence the Martyr, St. Mary Magdalen, Our Lady of Divine Providence, and Our Lady of Perpetual Help. Doc. 264, p. 32; Ex. S–34, p. 3.

9. St. Elizabeth Ann Seton Parish now has a    parochial elementary school.

129. The Second Edition sets forth the present policy of the Jefferson Parish School Board regarding out-of-district transportation for nonpublic school students. Section 11(a) states: "Students shall not be transported from their home-district to a school in another district except as approved in the annual agreements between non-public school representatives and the Jefferson Parish School Board." Ex. S–19, p. 22.

130. From the 1976–77 school year until the 1988–89 school year, the policy of the Jefferson Parish School Board concerning out-of-district transportation of nonpublic school students was:

> Students ***shall not be transported*** from their home district to a school in another district if **1. There is a home-district school of suitable grade organization, *AND* 2. The home district school is capable of accommodating a greater number of students from other districts than there are home district students attending other schools.**

Ex. P–411; Doc. 267, p. 82.

131. Mr. Horne explained how the Transportation Department interpreted these restrictions regarding the transportation of nonpublic school students who were enrolled in nonpublic schools outside of their church parishes. Doc. 274, p. 91. The first restriction was that if a student could be enrolled at the nonpublic school within his church parish but chose to attend another nonpublic school, he was not eligible for transportation. *Id.* The second restriction was that if the student resided in a church parish that either had no school or had a school that could not accommodate all of the students who lived there "then he or she could be transported to a school that had space to accommodate him provided that there were forty or more students attending that school and the [Transportation Department] could obtain approval from the state Department of Education to implement and fund the route." *Id.* at 91–92.

132. At the beginning of the 1988–89 school year, the Jefferson Parish School Board did not fund the transportation of any nonpublic school students out-of-district. Doc. 267, p. 42. Eventually, the JPSB provided bus transportation to students from a church parish that had no nonpublic school to a church parish that did have a nonpublic school, because the parents of nonpublic bus passengers paid the JPSB for these services. *Id.* at 43.

133. For the 1989–90 school year, the Jefferson Parish School Board furnished "nonpublic school out-of-church parish transportation" to a reduced number of nonpublic schools. *Id.* at 53. Only state funds were used and there was no cost to the parents or to the Jefferson Parish School Board. *Id.* at 53–54.

134. Mr. Horne testified as to the changes that occurred from December 1985 until the 1988–89 school year which resulted in the revised Jefferson Parish School Board policy concerning out-of-district transportation for nonpublic school students:

> There were time schedule changes. There were recommendations to look at the feasibility of combination bus routes. There were established policies for nonpublic schools relative to central pick-up points, transit type routing, elimination of transportation in certain districts.
>
> When the cuts came down from the state for the 1988–'89 year there were some very dramatic changes taken to cut back particularly in the area of high school transportation. There were further restrictions on the out-of-district transportation. We eliminated service to any students who lived in a church parish that had a school, so we eliminated that category altogether. The only students that could receive transportation out of district after '80—beginning with '88–'89 were those students who lived in a parish that had no school. There were a variety of changes made during that five, five-year period.

Doc. 274, p. 104.

135. JPPSS transports public school students who require special education and ESL services to special schools outside of their home district. Doc. 267, p. 77.

136. JPPSS also transports public school students out-of-district in accordance with a court ordered desegregation plan. Doc. 266, p. 5.

137. The JPPSS permits any public school student in grades K–12 to apply to attend a public school outside of his attendance district by obtaining a "transfer request form." Ex. S–18, p. 25.

138. "[T]housands" of public school students have received "permits" to attend public schools in other districts "and in some cases they are provided transportation and in some cases they are not ... There is no cost to the parents." Doc. 263, p. 63–64.

139. The First Edition which applies to public school students states, in capital letters, that "TRANSPORTATION OF STUDENTS WHO ARE GRANTED TRANSFERS IN ACCORDANCE WITH THESE PROCEDURES SHALL BE THE RESPONSIBILITY OF THE PARENT(S) OR LEGAL GUARDIAN(S)." Ex. S–18, p. 26.

140. Notwithstanding this condition, Mr. Horne testified that the JPPSS provides school bus transportation to some public school students who have been granted transfer permits "if it is not necessary to reroute the bus, there is space available and the student behaves himself or herself on the bus, they meet the bus at a designated bus stop and we can accommodate the child, since we are in the business of kids we certainly do it." Doc. 263, p. 64.

141. The Jefferson Parish School Board did not charge public school students for out-of-district transportation because "[c]ounsel advised the Jefferson Parish School Board that the laws of the State of Louisiana would not permit them to do so." Doc. 274, p. 101.

142. The Court finds that there is limited out-of-district busing for both public and nonpublic school students in Jefferson Parish.

143. Funding for school transportation in Louisiana consists of two categories: base pay and operational pay. Doc. 263, p. 91. Base pay consists of salaries paid to the bus drivers. Operational pay is "a mileage payment given to the driver who owns or operates his bus or in the case of a school district that owns its own fleet of buses the same rate of pay is provided based on mileage." *Id.* at 91–92. There are other fixed costs including vehicle liability insurance, health insurance, retirement benefits, and sick leave. *Id.* at 92.

144. In addition to the state funding for transportation, the Jefferson Parish Public School System also provides additional base pay and additional operational pay to the bus drivers. Doc. 263, p. 92. Mr. Horne explained that these local supplements were justified because "we work our drivers a longer day, we assign them additional routes, there is more wear and tear in this area and we feel that in order to have a quality fleet that we have enjoyed for a long time we have to do that." *Id.* at 92.

145. For the 1988–89 school year, the "average" income for bus drivers, including salary and operational pay, was $24,364.60. This figure was arrived at by subtracting the salaries of the bus attendants, $356,756.40, from the grand total salaries of $9,152,379.00, and dividing that amount by 361, the number of bus drivers. Ex. P–361; Doc. 274, pp. 127–28.

146. Bus drivers employed by the Jefferson Parish School Board are permitted to have other employment and the "only requirement is that no other job can interfere with their work in the Jefferson Parish school system." Doc. 273, p. 147.

147. School bus drivers are paid according to the trip involved and not according to the number of students assigned to their buses in order to "curtail overloading buses." Ex. S–18, p. 62.

148. From 1980 until 1988, nonpublic school transportation was handled by an agreement between the State of Louisiana and the school board which had the authority to elect to transport or not to transport nonpublic school children. Doc. 265, p. 108.

149. In 1988, the Louisiana legislature separated the funding of transportation for nonpublic school children from the funding of transportation for public school children. *Id.* at 108. Although the funding of public school transportation continued to remain a part of the minimum foundation formula, the nonpublic school transportation was funded through a separate supplemental school assistance arrangement which was outside of the minimum foundation formula. *Id.*

150. On July 27, 1988, Wilmer S. Cody, State Superintendent of Education, informed Dr. Russell J. Protti, Superintendent of the Jefferson Parish Schools, by letter that for the 1988–89 school year, the allocation of funds for the transportation of nonpublic school students would be a *separate* appropriation from the funds appropriated for the public school students. Ex. S–20. The funds for nonpublic school transportation were reduced 25% for the 1988–89 school year. Ex. S–20. The Jefferson Parish Public School System was allocated $1,211,849.00 to provide transportation for the nonpublic school students in Jefferson Parish. *Id.* Mr. Cody recommended "that representatives from your system meet with representatives of the non-public schools to formulate a formal agreement for services to be rendered during the school year which takes this budget reduction into consideration." *Id.* This agreement, which was to be signed by a representative of the Jefferson Parish Public School System and the appropriate representatives of the nonpublic schools, had to be submitted to the Louisiana Department of Education before any transportation funds would be distributed. Ex. S–20; P–477.

151. Because of financial difficulties that the Jefferson Parish Public School System was experiencing, the Transportation Department decided to recommend to the School Board that no local supplement be paid for funding nonpublic school transportation. Doc. 263, p. 93.

152. Several meetings were held in July and August 1988 to discuss the reduction in state funding for nonpublic school transportation. Ex. P–518. Various representatives of the Jefferson Parish Public School System, the Archdiocese of New Orleans, and other non-public schools attended the meetings. At the meeting held on August 16, 1988, Howard Jenkins, Tom Rayer, Dr. Russell J. Protti, George Horne, and Jack Grant reached an agreement on terms and conditions. Ex. P–518; Doc. 264, pp. 15–17. At that meeting it was agreed that:

1. Transportation expenses for Catholic school students for the 1988–89 school year will be limited to the reimbursement from the State of Louisiana in the amount of $1,105,000.00; and

2. In order to meet the aforesaid amount it is necessary to eliminate all of the costs of out-of-district student bussing (sic) and approximately 50% of the costs of high school student bussing (sic) during the 1988–89 school year.

Ex. P–476. The agreement was signed by Elton M. Lagasse, President of the Jefferson Parish School Board, and Howard Jenkins, Superintendent of the Archdiocese of New Orleans. *Id.*

153. On August 19, 1988, agreements were reached with the following nonpublic schools: Atonement Lutheran School, Chinchuba Institute, Concordia Lutheran School, Salem Lutheran School, and Westbank Association for Retarded Citizens. Ex. P–518, p. 11. In addition, the Jefferson Parish School Board agreed that Faith Lutheran School and Westbank Cathedral Academy, which did not wish to contract with JPPSS for transportation services, could receive their pro rata share of the state funds to be applied to privately contracted services. *Id.* at 11.

154. In the agreement entered into between the Jefferson Parish School Board, "as local agent for the Louisiana Department of Education," and West Bank Cathedral Academy, it was agreed that payments for transportation for 1988–89 would be made with the following stipulations:

1. Payment is made in lieu of actual transportation services by the Jefferson Parish Public School System.

2. The amount of $15,539 is seventy-five percent (75%) of the pro-rata state reimbursement for transportation in 1987–88, and represents the authorized payment by the State Department of Education for 1988–89.

3. If said payment is determined to be unconstitutional, illegal or in violation of Louisiana Department of Education policies and procedures, Westbank Cathedral Academy agrees to refund to the Jefferson Parish School Board the full amount of $15,539 within thirty (30) days of the date of notification of the violation.

Ex. P–316. An identical agreement was entered into by the JPSB with Faith Lutheran School for the 1988–89 school year, the only variation being that the amount of money to be paid to Faith Lutheran was to be set at $6,563. *Id.*

155. For the 1989–90 school year, the agreements with Westbank Cathedral Academy and Faith Lutheran School were modified to include the language that "[t]he money shall be used for transportation services only." Ex. S–24.

156. The Transportation Department was not advised as to the cost of the transportation services for those two schools. Doc. 263, pp. 10–11.

157. Westbank Cathedral Academy used the transportation funds to pay for repairs to the school's own buses. *Id.* at 10.

158. The Court finds that Westbank Cathedral Academy and Faith Lutheran School had control over the transportation money paid to them by the Jefferson Parish School Board.

159. For the 1988–89 school year, the Jefferson Parish Public School System began the year with no out-of-district transportation for nonpublic elementary schools. Doc. 267, p. 42.

160. As a result of a meeting held in September 1988 with the Archbishop of New Orleans, various members of the Jefferson Parish School Board, Mr. Horne, and Superintendent Protti, the Archdiocese of New Orleans agreed to assume responsibility for the shortfall in state funding, and transportation services were restored to the prior year's level. Doc. 262, pp. 65–66. "[O]ut-of-district busing" was then provided to the nonpublic schools and the transportation services were funded by the state and "by the parents of elementary school students, Catholic elementary school students specifically." Doc. 267, pp. 43–44, 53.

161. During the 1988–89 school year all parents of nonpublic school students receiving transportation services were required to pay a fee for transportation, whether their child was being transported within the district or out of the district. *Id.* at 113. "The decision was made by Archdiocesan school officials and not by the Jefferson Parish school system that all these students would share the cost." *Id.* at 114.

162. For the 1988–89 school year, the amount of $24.00 was charged per child to fund out-of-church parish transportation. Doc. 276, p. 25. The $24.00 figure was arrived at by determining the difference between the projected cost of transportation and the projected revenue from the state. *Id.* All children receiving bus transportation were charged $24.00, whether they were being transported in-parish or out-of-parish. *Id.* at 25–27.

163. The Jefferson Parish School Board discontinued some of the nonpublic school transportation in May 1988 because of the failure of the JPSB to receive all of the funds from the Catholic schools. Doc. 262, p. 67.

164. At these meetings during 1988–89, Mr. Horne and his staff discussed transportation, not religion, with representatives of the administrations of all nonpublic schools. Doc. 267, p. 70–71.

165. At the meeting with the state education officials, including Mr. Jennings Cleveland, "the person who handles the budgets and other programs for the Department of Education," in August 1988, Mr. Horne understood that the Jefferson Parish School Board would have to reach an agreement with the individual nonpublic schools or "with whatever other umbrella association or organization might exist" in Jefferson Parish in order to receive funding for transportation to those schools. Doc. 265, p. 62; Doc. 274, pp. 85–86.

166. Mr. Cleveland testified that if the School Board did not obtain the signature of the Catholic diocese on the agreement, the State would not disburse the transportation money for the nonpublic schools. Doc. 265, pp. 119–120.

167. Mr. Graig Luscombe, the Deputy Superintendent for Management and Finance in the Louisiana Department of Education, Mr. Cleveland's supervisor, disagreed with Mr. Cleveland's testimony. Mr. Luscombe stated that it was "not the policy of the department" to "primarily look[ ] at the

signatures of representatives of the dioceses throughout the State." Doc. 274, p. 14.

168. The Louisiana Department of Education has not encountered a situation where one representative of a nonpublic school has entered into an agreement concerning transportation funds with the local school board and another nonpublic school has not entered into the agreement. *Id.* at 10.

169. Mr. Luscombe testified that the policy of the Louisiana Department of Education is to make "a pro rata reduction" to the parish if an agreement has not been reached with all of the nonpublic schools. *Id.* at 17. The pro rata reduction would be based on figures calculated for the 1987–88 school year. *Id.*

170. At the time of the trial, if a nonpublic school did not participate in the transportation program for the 1987–88 school year, the State would not allow that nonpublic school to participate in the transportation program for any other school year. *Id.* at 18–19.

171. On June 21, 1989, the Jefferson Parish School Board approved a nonpublic school transportation plan based on the receipt of $1,211,849.00 from the State. Ex. S–24.

172. On July 24, 1989, the JPPSS received notice that the State had increased the funding for nonpublic school transportation by $278,788.00, for a total of $1,490,637.00. *Id.*

173. The Jefferson Parish School Board did not establish any additional bus routes with the increase in funding. Doc. 264, p. 81.

174. The Transportation Department and the Archdiocese of New Orleans discussed two possibilities for using the additional funds: (1) additional bus stops and (2) providing "privately contracted bus service for those students who had been eliminated from the transportation plan or from the transportation services...." *Id.* at 41.

175. "Very few additional bus stops were actually put in place" with the additional funds. *Id.* at 36.

176. The Jefferson Non–Public School Transportation Corporation was then formed on September 28, 1989. Ex. P–775. The objects and purposes of this non-profit corporation are as follows:

> To provide transportation for the children of parents residing in the Parish of Jefferson who have enrolled their children in parochial schools within the Parish of Jefferson other than their own church parish because of the fact that the parish in which said parents reside does not operate a parochial school, through means of contractual relationships with third parties for the providing of such services, and or the purchase or acquisition of equipment or the employment of persons in connection with the providing of such transportation services; and to enter into any and all other contractual arrangements of lease, purchase or joint venture which this corporation may deem necessary or appropriate in order to provide adequate means of transportation for said children; to enter into agreements with the Jefferson Parish School Board for reimbursement of the cost of such transportation; and to receive donations, gifts or bequests in furtherance of said objects and purposes, and to do and perform all and every act, matter and thing that non-profit corporations are, by law, authorized to do and perform.

*Id.*

177. The Jefferson Non–Public School Transportation Corporation has members from six nonpublic schools: St. Christopher, St. Catherine of Siena, St. Louis King of France, St. Agnes, St. Angela Merici, and St. Matthew the Apostle. Ex. P–776; Doc. 264, pp. 47–48.

178. On February 6, 1990, the Jefferson Parish School Board paid the Jefferson Non–Public School Transportation Corporation the amount of $100,195.00 "in lieu of transportation services previously provided by the Jefferson Parish Public School System for some of the students attending St. Agnes, St. Angela, St. Catherine of Siena, St. Christopher, St. Louis and St. Matthew Schools." Ex. P–774.

179. The $100,195.00 was paid to "privately contracted bus drivers" who provided bus services for 368 students attending St. Agnes, St. Angela Merici, St. Catherine of

Siena, St. Christopher, St. Louis King of France, and St. Matthew the Apostle. Ex. P–781.

180. Out of the $100,195.00, the sum of $13,200.00 was to pay for the transportation of 33 students to St. Agnes; $14,400.00 was for transporting 31 students to St. Angela Merici; $45,040.00 was for transporting 193 students to St. Catherine of Siena; $9,630.00 was for transporting 36 students to St. Christopher; $15,000.00 was for transporting 62 students to St. Louis King of France; and $2,925.00 was for transporting 13 students to St. Matthew the Apostle. Doc. 264, pp. 58–59; Ex. P–781.

181. The Court finds that the funds paid to the Jefferson Non–Public School Transportation Corporation were clearly spent for transportation of nonpublic school students.

182. For the 1989–90 school year, approximately 2,000 "nonpublic Catholic school students in the Archdiocese of New Orleans" attending "east bank and west bank elementary and secondary" schools "who wanted transportation" were denied transportation by the Jefferson Parish School Board. Doc. 264, pp. 72–73.

*CONCLUSIONS OF LAW*

1. In *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the United States Supreme Court held that the Establishment Clause of the First Amendment does not forbid a State from paying for the transportation of school children to parochial as well as public schools. The *Everson* Court "approved a system under which a New Jersey board of education reimbursed parents for the cost of sending their children to and from school, public or parochial, by public carrier." *Wolman v. Walter,* 433 U.S. 229, 253, 97 S.Ct. 2593, 2608, 53 L.Ed.2d 714 (1977).

2. In considering a transportation program, the *Wolman* Court noted that the two critical factors are that "the school has no control over the expenditure of the funds and the effect of the expenditure is unrelated to the content of the education provided." 433 U.S. at 253, 97 S.Ct. at 2608.

3. The *Wolman* Court held that providing transportation for field trips to nonpublic school students was unconstitutional. *Id.* at 254, 97 S.Ct. at 2608–09. The Court found impermissible that the nonpublic schools controlled the timing and frequency of the field trips and so were the primary recipients of the service. *Id.* at 253, 97 S.Ct. at 2608. In addition, the Court noted that "field trips are an integral part of the educational experience . . .," and thus there is a risk of fostering religion. *Id.* at 253–54, 97 S.Ct. at 2608–09.

4. The transportation system in *Everson* was found to be constitutional "because the school did not determine how often the pupil traveled between home and school—every child must make one round trip every day—and because the travel was unrelated to any aspect of the curriculum." *Wolman,* 433 U.S. at 253, 97 S.Ct. at 2608.

5. As in *Everson,* bus transportation was provided by the Jefferson Parish School Board for one round trip per day and the bus transportation was "unrelated to an aspect of the curriculum" of the nonpublic schools. *Wolman,* 433 U.S. at 253, 97 S.Ct. at 2608. The children are the primary recipients of the transportation service in Jefferson Parish, not the nonpublic schools. *Id.*

6. In *Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), the Supreme Court held that the Constitution prohibited the State of Mississippi from providing free textbooks to private schools which had racially discriminatory policies. "That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination." *Id.* at 463, 93 S.Ct. at 2809.

7. The *Norwood* Court distinguished between parochial schools and private schools, noting that parochial schools "pursue two goals, religious instruction and secular education." 413 U.S. at 468, 93 S.Ct. at 2812. The Supreme Court found that States may provide assistance to parochial schools in performing their *secular* functions "where carefully limited so as to avoid the prohibitions of the 'effect' and 'entanglement' tests." *Id.* This assistance may be provided for two reasons: the substantial interest of the states

in the quality of education provided by private schools and "because assistance properly confined to the secular functions of sectarian schools does not substantially promote the readily identifiable religious mission of those schools and it does not interfere with the free exercise rights of others." *Id.*

8. A state is not "constitutionally obligated to provide even 'neutral' services to sectarian schools." *Norwood,* 413 U.S. at 469, 93 S.Ct. at 2813.

9. The *Everson* Court held that the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them." 330 U.S. at 18, 67 S.Ct. at 513.

10. The Supreme Court has recently restated this principle of neutrality in *Zobrest v. Catalina Foothills School Dist.,* —— U.S. ——, ——, 113 S.Ct. 2462, 2466, 125 L.Ed.2d 1 (1993). The *Zobrest* Court noted that the Supreme Court has "consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit." *Id.*

11. Plaintiffs claim that the transportation system in Jefferson Parish, in particular the fact that each bus route services a single school, violates the neutrality concerns of the Establishment Clause of the First Amendment in its application.

12. The JPPSS student transportation program has the valid secular purpose of helping "parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." *Everson,* 330 U.S. at 18, 67 S.Ct. at 513. "Protecting the child against the hazards of traffic, the exposure to inclement weather and the designs of persons who would harm them are well recognized secular governmental interests." *Springfield School District v. Pennsylvania Dep't of Educ.,* 483 Pa. 539, 550, 397 A.2d 1154, 1160, *appeal dismissed for want of a substantial federal question sub nom. School District of Pittsburgh v. Pennsylvania Dep't of Educ.,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979).

13. School bus transportation of nonpublic school students to and from school has not been found to advance religion. *Everson,* 330 U.S. at 18, 67 S.Ct. at 513; *Meek v. Pittenger,* 421 U.S. 349, 364–65, 95 S.Ct. 1753, 1762–63, 44 L.Ed.2d 217 (1975); *Lemon v. Kurtzman,* 403 U.S. 602, 616–17, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971). The travel of nonpublic school students to their schools is not related to the religious mission of the nonpublic schools. *Norwood,* 413 U.S. at 468, 93 S.Ct. at 2812.

14. In *Wolman,* the Supreme Court held constitutional "providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools...." 433 U.S. at 248, 97 S.Ct. at 2605. The *Wolman* Court emphasized the location where the services were to be performed, stating "[t]he fact that a unit on a neutral site on occasion may serve *only* sectarian pupils does not provoke the same concerns that troubled the Court in *Meek.*" *Id.* at 247, 97 S.Ct. at 2605 (emphasis added). In *Meek,* the Supreme Court was worried that "publicly employed personnel" might instruct the students in their religious beliefs either directly or indirectly. *Id.* The "danger arose from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school." *Id.*

There has been no evidence presented that JPPSS bus drivers might impart any religious beliefs to their bus passengers. As the *Wolman* Court emphasized, "the nature of the institution, not ... the nature of the pupils" is the concern when public employees provide services only to nonpublic school students. *Id.* at 247–48, 97 S.Ct. at 2605. The JPPSS school buses are "truly religiously neutral locations." *Id.* at 247, 97 S.Ct. at 2605.

15. In *Lemon,* 403 U.S. at 616–17, 91 S.Ct. at 2113, the Supreme Court noted that the Establishment Clause permits bus transportation "supplied in common to all students."

16. In *Members of Jamestown School Comm. v. Schmidt,* 699 F.2d 1 (1st Cir.), *cert. denied,* 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983), the First Circuit Court of Appeals carefully analyzed a Rhode Island statute that provided for the busing of nonpublic school children to schools outside of their districts. The *Jamestown* Court stated that the Supreme Court in *Wolman* and other decisions has "referred uniformly to the constitutionality of transporting sectarian students as part of a 'general' program 'neutrally' provided 'in common' to 'all' school children." 699 F.2d at 9. The *Jamestown* Court found that "common to all" does not require "absolute equality" of access to busing or expenditure on busing for public and nonpublic school students. *Id.* Rather the court interpreted this "common to all" language to mean:

> Whether busing is within a district or across district lines, public and parochial students must be eligible for busing to *their* schools on the same terms: if distance is the criterion and sectarian students living a certain distance from their school are eligible for busing at public expense, public students living the same distance from their school must likewise be eligible.
>
> Just as important, the relative costs per-student of sectarian and public school busing must remain roughly proportional.

*Id.*

17. The *Jamestown* Court found that the distance the students travelled on the buses was relevant to determine whether "the increased hazards of travel over increasing distances and for increasing times may outweigh the benefits of the bus." *Id.* at 10.

18. The Court does not find that the Jefferson Parish School Board has violated the neutrality concerns of the Establishment Clause of the First Amendment. The Court finds that the Jefferson Parish School Board has provided unique bus routes, to all schools, regardless of whether the school is public or nonpublic. The Jefferson Parish School Board has made the determination that this type of transportation program best serves its citizens. No evidence was presented to the Court that the unique bus routes offer any "direct and immediate benefit" to religion. In fact, the evidence suggests that service to nonpublic schools would be improved if combination routes were used by the Jefferson Parish School Board in its transportation program. Thus, the Court does not find that unique bus routes serving only students attending a particular school, whether public or nonpublic, have the primary effect of advancing religion.

19. The Court finds that the cost of transporting nonpublic school students in Jefferson Parish is not "grossly disproportionate" to the cost of transporting public school students. *Jamestown,* 699 F.2d at 10. Thus, the expenditure on nonpublic school transportation, including the out-of-district routes, does not suggest that Jefferson Parish School Board's transportation program provides more benefits to nonpublic school children, than public school children. The fact that the Jefferson Parish School Board has refused to contribute local funds to nonpublic school transportation for several years because of financial concerns convinces the Court that the Jefferson Parish School Board did not confer any "direct and immediate" benefits to religion. *Id.*

20. The First Circuit Court of Appeals in *Jamestown* concluded that "where a forbidden purpose or an impermissible primary effect is indicated, or where palpable disparity has bred significant divisiveness along religious grounds, ... a busing program will have ceased to be a 'general' program of secular benefits neutrally available to all, and will have crossed the line from providing a 'remote and incidental' benefit to offering a 'direct and immediate' benefit to religion." *Id.*

21. The Court finds no impermissible purpose or effect in the decision of the Jefferson Parish School Board to assign busing of students according to the schools they attend. Each school is treated approximately the same, whether public or nonpublic, even though it appears to the Court that greater benefits are provided to the public school students. The nonpublic schools may be afforded more out-of-district busing than the public schools. This is directly attribut-

able to the fact that several church parishes do not have elementary schools. There has been no evidence presented to show any illicit motives in the failure of the Archdiocese of New Orleans to establish nonpublic schools in these church parishes.

In the instant case, parochial school students are bused to out-of-district parochial schools, if their church parish does not have a parochial school. A similar situation does not exist for the public schools in that there is no district without a public school. Public school students are not ordinarily bused to an out-of-district school, unless they are special education students, English as a second language students, or because of court ordered integration. If a public school student receives a transfer permit to attend an out-of-district public school, he is responsible for his own transportation to that school, unless he can make special arrangements.

The public school students, on the other hand, are provided with the most preferable busing, that is, busing on in-and-out routes, while the nonpublic school students are provided transit type routing and central pick-up locations in order to insure that 40 students are on the bus. There is no minimum requirement of passengers for buses travelling to public schools as there is for the nonpublic schools.

22. The *Jamestown* Court did not find it constitutionally significant that parochial students were bused over special routes rather than established public school routes. 699 F.2d at 9. In fact, the *Jamestown* Court noted that the parochial students "must necessarily be bused on other than established public school routes," because they were being bused to nonpublic schools beyond public school district lines. *Id.* The fact that different routes were used by the nonpublic schools and the public schools suggests strongly to the Court that separate buses were used for transporting the students. *Id.*

23. Considering all of the evidence and the law, the Court does not find that the Establishment Clause mandates the creation of combination routes to transport public and nonpublic school students in Jefferson Parish. The Court finds that the Jefferson Parish School Board's bus transportation program which results in separate transportation of public and nonpublic school children is constitutional in its application.

24. The Court finds that the transportation statute, as amended, will not foster any excessive entanglement of church and state in Jefferson Parish. The Supreme Court has recognized that "[s]ome limited and incidental entanglement between church and state authority is inevitable in a complex modern society...." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982). The usual contacts between church and state over nonpublic student transportation "are ministerial and mechanical in nature, and concern administrative, not religious matters." *Jamestown*, 699 F.2d at 12. They do not create an excessive entanglement of church and state.

25. In *Jamestown*, the First Circuit Court of Appeals found that contacts between public school and parochial school administrators discussing proper scheduling and routing of buses were ministerial and did not involve religious matters. *Id.* at 12. The Court finds that the discussions between the Jefferson Parish School Board and nonpublic school officials concerning transportation districts, routing, and scheduling were also acceptable contacts which did not involve religious matters.

26. Public school parents had objected to the starting times of public and nonpublic schools. Their concerns were considered by a Task Force comprised of both public and nonpublic school representatives, and were resolved favorably and equitably by the Jefferson Parish School Board. These were not religious concerns, but rather concerned administrative matters, and were effectively addressed through administrative channels.

27. The decrease in funding by the State for nonpublic school transportation and the failure of the Jefferson Parish School Board to allocate any funds for nonpublic school transportation beginning with the 1988–89 school year created a controversy between the nonpublic schools and the Jefferson Parish School Board. Especially divisive was the fact that a fee was imposed on nonpublic school students for transportation services

provided by the Jefferson Parish School Board. As in *Jamestown,* this type of controversy poses "a risk of constitutionally significant division along religious lines, for in such a case, parochial school parents have a special political interest as *parochial school parents....*" *Jamestown,* 699 F.2d at 12.

28. The Court finds that the amendments to the transportation statute have eliminated any such controversy in the future because of the specification of "free" transportation; the tighter restrictions placed on a local school board seeking to eliminate or reduce transportation services; and the requirement that any reduction or elimination in student transportation services not have a "disparate impact" on either public or nonpublic school students. La.Rev.Stat.Ann. § 17:158(A), (H). Nonpublic school children can no longer be assessed any fee for bus transportation provided by the Jefferson Parish School Board. The Court finds that the amendments and additions to the transportation statute are an attempt to ensure that financial problems of the local school boards do not result in inequitable treatment to either public or nonpublic school students.

29. The Court finds that the amendments to the transportation statute have effectively eliminated the possibility of further political divisiveness along religious lines and any excessive entanglement between the Jefferson Parish School Board and the nonpublic schools.

30. The Court finds that the allocation of state transportation funds directly to Westbank Cathedral Academy and Faith Lutheran School by the Jefferson Parish School Board is an unconstitutional direct subsidy to nonpublic schools. The schools themselves control the expenditure of the funds. In addition, the Jefferson Parish School Board did not require an audit or other verification to ensure that the funds were spent only for transportation and not for religious purposes. Applying the clear holding of *Wolman* that the nonpublic school is to have no control over the expenditure of the funds, 433 U.S. at 253, 97 S.Ct. at 2608, the Court finds that the transportation contracts between Westbank Cathedral Academy and the Jefferson Parish School Board and between Faith Lutheran School and the Jefferson Parish School Board violate the Establishment Clause.

31. The Jefferson Parish Nonpublic School Transportation Corporation, with which the Jefferson Parish School Board contracted to provide transportation to some students attending Catholic schools, is an independent corporation which does not operate a school, engages in no instructional activity, and has used funds provided to it exclusively for the purpose of transporting nonpublic school children to and from their schools. Doc. 265, pp. 28–31, 58–60. La. Rev.Stat. § 17:158(A)(4) specifically allows a parish school board to enter into contracts for school bus transportation. The Court finds that this contract does not violate the Establishment Clause.

32. With the exception of the transportation contracts between Westbank Cathedral Academy and the Jefferson Parish School Board and between Faith Lutheran School and the Jefferson Parish School Board, the Court finds that the Jefferson Parish School Board's bus transportation program does not result in excessive entanglement.

33. Plaintiffs also assert that the student transportation program in effect in Jefferson Parish violates the Equal Protection Clause of the Fourteenth Amendment. They claim that the state and the Jefferson Parish School Board have classified transportation funds and bus routes into two groups based upon whether the child attends a public or a nonpublic school.

34. The Court does not find that assigning unique bus routes for each school, whether public or nonpublic, infringes upon fundamental rights and demands strict scrutiny. The Court will apply the rational basis test because student transportation falls within "the area of economics and social welfare." *Dandridge v. Williams,* 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *Springfield,* 483 Pa. at 568 n. 18, 397 A.2d at 1169 n. 18; *McCarthy v. Hornbeck,* 590 F.Supp. 936, 946 (D.Md.1984).

35. The burden is on plaintiffs to convince this Court "that the legislative facts on which the classification is apparently based could

not reasonably be conceived to be true by the governmental decisionmaker." *McCarthy,* 590 F.Supp. at 946 (quoting *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981)).

36. In *Norwood,* the Supreme Court stated:

> It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.

413 U.S. at 462, 93 S.Ct. at 2809.

37. The Supreme Court in *Norwood* found that the Equal Protection Clause does not require a state to provide financial assistance to parochial schools. *McCarthy,* 590 F.Supp. at 947. Since the Equal Protection Clause does not require the State to allocate any funds for nonpublic school transportation, the Court finds that a separate appropriation for nonpublic school transportation does not violate the Equal Protection Clause. The State must appropriate funds for public school transportation. Thus, it is logical to the Court that in formulating the budget, the State separated the mandatory appropriation for public school education, which includes transportation, from the optional appropriation for nonpublic school transportation, which is not required under the Equal Protection Clause. Transportation of public school children and transportation of nonpublic school children are different priorities to the State. *Id.*

38. As to the separate bus routes assigned to each school, whether public or nonpublic, the Court finds that this procedure does not confer greater benefits upon nonpublic school students than upon public school students. The Jefferson Parish School Board has a rational basis for concluding that this is the safest type of transportation for all of its students. It is obvious to the Court that it is usually safer for students to remain on one bus and not have to transfer to another bus for additional transportation. In addition, it is obvious that for elementary school students especially, it is safer for all of the students to exit at one school rather than risk a child exiting at the wrong school. Thus the Court rejects plaintiffs' Equal Protection challenge to the policy of the Jefferson Parish School Board to assign separate bus routes to each school, whether public or private.

### *C. WHETHER THE STATE STATUTE AUTHORIZING A FLAT RATE REIMBURSEMENT TO PARENTS TRANSPORTING THEIR CHILDREN TO SCHOOL IS UNCONSTITUTIONAL ON ITS FACE AND AS PREVIOUSLY ADMINISTERED AND APPLIED.*

#### *FINDINGS OF FACT*

1. La.Rev.Stat. § 17:158(C) now provides:

> If transportation is not provided by the parish or city school board by reason of economically justifiable reasons approved by the State Board of Elementary and Secondary Education in accordance with the provisions of Subsection H of this Section, the Department of Education, in accordance with the provisions of Subsection D hereof, shall reimburse the parent or tutor of any student who resides more than one mile from the school attended by the student to the extent and in the amounts that funds are so appropriated by the legislature, but in no event shall such reimbursement exceed one hundred twenty-five dollars per student or three hundred seventy-five dollars for any one family.

La.Rev.Stat.Ann. § 17:158(C) (West Supp. 1994).

2. La.Rev.Stat. § 17:158(D) provides that each parent or tutor applying for reimbursement shall submit a claim in the form of an affidavit, which affirms the accuracy of the claim.

> [The] form shall contain a statement that any person who knowingly or willingly violates the provisions of this Section by filing a false claim or fraudulent claim shall be guilty of a misdemeanor and shall be imprisoned for not more than one (1) year or fined not more than $500 or both, and that the filing of any false claim shall be and

> *constitute a violation of the criminal laws* of the state of Louisiana and particularly shall constitute false swearing under the provisions of R.S. 14:125.

La.Rev.Stat.Ann. § 17:158(D) (West 1982).

3. La.Rev.Stat. § 17:158(C) was amended after the trial of this matter. At the time of trial, the statute required the Department of Education to reimburse "the parent or tutor of any student who resides more than one mile from the school attended by the student at the rate of One Hundred Twenty-five and no/100 dollars per student not to exceed Three Hundred Seventy-five and no/100 for any one family." La.Rev.Stat.Ann. § 17:158(C) (West 1982). In 1992, the statute was amended to limit the reimbursement to the amount of funds appropriated by the legislature, if any, but the reimbursement is not to exceed $125.00 per student or $375.00 per family. La.Rev.Stat.Ann. § 17:158(C) (West Supp.1994).

4. Neither the original version of La.Rev. Stat. § 17:158(C) nor the amended version limits the amount to be reimbursed to parents to the actual costs incurred in transporting the student to and from school.

5. Plaintiff contends that the problem with § 17:158(C) is "the fact that the amount of reimbursement here does not depend upon the expenses actually incurred; to the extent that this $125 per child exceeds the actual transportation expenses for a child attending a sectarian school, there would be a positive incentive to send one's children to such a school, violating the Establishment Clause." Note, *The Constitutionality of Louisiana Aid to Private Education,* 44 La.L.Rev. 865, 867 (1984).

6. The Louisiana legislature has not appropriated funds since 1985 for the "Transportation Reimbursement Program." Doc. 336, p. 70, Stip. Fact 32.

7. The State of Louisiana has not made any transportation reimbursement payments since 1986. Doc. 336, p. 70, Stip. Fact 33; Doc. 264, p. 89.

8. The statutory requirements for eligibility for reimbursement of transportation costs pursuant to the Transportation Reimbursement Program are identical for the parents of children attending either public or nonpublic schools. La.Rev.Stat.Ann. § 17:158(C), (D) (West Supp.1994).

9. The Bureau of Transportation of the Louisiana Department of Education administered the Transportation Reimbursement Program when it was funded. Doc. 336, p. 70, Stip. Fact 34.

10. The Bureau of Transportation was eliminated as of July 1, 1988. Ex. S–1; East 1/11/89 Dep. 14.

11. When the Transportation Reimbursement Program was funded and in operation, reimbursement payments were sent by the Bureau of Transportation directly to the parents and no transportation reimbursement funds were sent to any public or nonpublic schools.

*CONCLUSIONS OF LAW*

1. Plaintiffs must satisfy the threshold requirement of Article III of the Constitution by alleging an actual case or controversy. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983).

2. Plaintiffs "must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 375, 78 L.Ed.2d 58 (1983).

3. If no resolution of the dispute can redress plaintiffs' injuries, then the dispute is "classically 'moot.'" *Id.* at 70–71, 104 S.Ct. at 375.

4. Plaintiffs contend that the dispute over reimbursement for transportation expenses is not moot because there is no guarantee that the legislature will not fund the reimbursement provision of La.Rev.Stat. § 17:158 at some time in the future.

5. Even though the reimbursement provision of La.Rev.Stat. § 17:158 has not been funded since 1985, the Court finds that the issue as to the constitutionality of the statute is not moot. The Court notes the coincidence that 1985, the year that funding for transportation reimbursement ceased, was also the year that this litigation was filed in this Court. The Court also finds relevant

the fact that La.Rev.Stat. § 17:158(C) was amended in 1992 to allow for a reduction in funding, yet the flat rate reimbursement procedure set forth in the earlier version of the statute was still maintained. There is no longer the requirement that each eligible parent receive $125.00 per child; an eligible parent may now receive a reduced amount depending on the funding by the legislature. It appears to the Court that the legislature contemplates funding the statute in the future with a reduced appropriation. Thus the Court agrees with the plaintiffs that the dispute over reimbursement for transportation expenses is not moot.

6. In *Everson v. Board of Education,* 330 U.S. 1, 3, 67 S.Ct. 504, 505, 91 L.Ed. 711 (1947), the Supreme Court upheld a state statute reimbursing parents for "money expended by them" in transporting their children to school by bus. In *Everson,* "the class of beneficiaries included *all* schoolchildren, those in public as well as those in private schools." *Mueller v. Allen,* 463 U.S. 388, 398, 103 S.Ct. 3062, 3068, 77 L.Ed.2d 721 (1983).

7. The class benefitted by La.Rev.Stat. § 17:158(C) is also all schoolchildren, those attending public as well as parochial schools.

8. The Court finds that the reimbursement of transportation expenses to parents of *both* public and nonpublic school children, authorized pursuant to La.Rev.Stat. § 17:158(C), is not "an impermissible 'direct subsidy'" of the parochial schools. *Zobrest v. Catalina Foothills School District,* — U.S. —, —, 113 S.Ct. 2462, 2469, 125 L.Ed.2d 1 (1993). The parochial schools are "not relieved of an expense that [they] otherwise would have assumed in educating [their] students." *Id.* The parents, not the parochial schools, are the direct beneficiaries of the flat rate reimbursement statute. Any indirect financial benefit that parochial schools may receive "is attributable to 'the private choices of individual parents.'" *Id.*

9. The Court finds that La.Rev.Stat. § 17:158(C) does not violate the Establishment Clause on its face or as previously administered and applied.

## *IV. CHAPTER 1*

### *WHETHER THE CAPITAL EXPENSE PROVISION OF CHAPTER 1 OF THE EDUCATION CONSOLIDATION AND IMPROVEMENT ACT OF 1981 IS UNCONSTITUTIONAL ON ITS FACE.*

### *FINDINGS OF FACT*

1. The plaintiffs challenge the facial validity of Chapter 1 of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. § 2727(d), which provides for funding for capital expenditures.

2. The Court has limited plaintiffs' challenge to § 2727(d) to a purely facial challenge. *Helms v. Clausen,* No. 85-5533 (E.D.La. Feb. 23, 1989) (Chasez, Mag.).

3. The first section of Chapter 1, 20 U.S.C. § 2701 (West 1990), sets forth the policy and purpose of Chapter 1:

> **(a) Declaration of policy.** In recognition of—
>
> (1) the special educational needs of children of low-income families and the impact of concentrations of low-income families on the ability of local educational agencies to provide educational programs which meet such needs, and
>
> (2) the special educational needs of children of migrant parents, of Indian children, and of handicapped, neglected, and delinquent children,
>
> the Congress declares it to be the policy of the United States to—
>
> (A) provide financial assistance to State and local educational agencies to meet the special needs of such educationally deprived children at the preschool, elementary, and secondary levels;
>
> (B) expand the program authorized by this division over the next 5 years by increasing funding for this division by at least $500,000,000 over baseline each fiscal year and thereby increasing the percentage of eligible children served in each fiscal year with the intent of serving all eligible children by fiscal year 1993; and
>
> (C) provide such assistance in a way which eliminates unnecessary administrative burden and paperwork and overly prescriptive

regulations and provides flexibility to State and local educational agencies in making educational decisions.

**(b) Statement of purpose.** The purpose of assistance under this chapter [20 U.S.C.S. §§ 2701 et seq.] is to improve the educational opportunities of educationally deprived children by helping such children succeed in the regular program of the local educational agency, attain grade-level proficiency, and improve achievement in basic and more advanced skills. These purposes shall be accomplished through such means as supplemental education programs, schoolwide programs, and the increased involvement of parents in their children's education.

20 U.S.C. § 2701.

4. Prior to July 1, 1985, public school teachers had provided Chapter 1 services to parochial school students on the premises of the parochial schools.

5. On July 1, 1985, the Supreme Court ruled in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), that New York City's provision of Chapter 1 services, which utilized public school teachers on the premises of parochial schools, violated the Establishment Clause of the federal Constitution.

6. In response to *Aguilar v. Felton,* Local Educational Agencies (hereinafter "LEAs") began to provide Chapter 1 services to eligible parochial school children at sites off of the premises of the parochial school—in leased mobile units, public schools or other off-premises real estate.

7. Due to the increased costs of providing off-premises sites, many parochial school children were unable to receive extra help in math and reading courses at neutral sites, as required by the Supreme Court. Congressional Record, Senate; December 1, 1987, at p. S.16818.

8. The Secretary of the United States Department of Education issued a document entitled "Guidance On *Aguilar v. Felton,*" which instructed LEAs to deduct the additional cost of providing Chapter 1 services to private schools from the LEA's total Chapter 1 allocation prior to apportioning funds between public and nonpublic school students.

9. The method proposed by the Secretary, codified in 34 C.F.R. § 200.52(a)(2) (1992), the "off-the-top" provision, was intended to meet the statutory obligation, under 20 U.S.C. § 2727(a) [10], of providing Chapter 1 services on an equitable basis to both public and nonpublic school children. *Barnes v. Cavazos,* 966 F.2d 1056, 1060 (6th Cir.1992); *see also* 54 Fed.Reg. 21,800 (1989) ("Particularly since *Aguilar v. Felton,* the administrative costs of providing educational services to private school children have become greater than the costs of providing such services to public school children. If these costs were deducted solely from the portion of the LEA's Chapter 1 funds designated to provide services to private school children, the remaining funds would not be sufficient to provide equitable instructional services to those children, thus defeating the purpose of the statutory provision.")

10. In 1988, Congress enacted § 2727(d), which authorizes funds to pay for the costs of maintaining Chapter 1 services off of the premises of parochial schools at "neutral sites." Under *Felton,* only parochial schools were required to conduct Chapter 1 services on "neutral sites"; therefore, § 2727(d) applies only to those attending parochial schools. *See Board of Education of the City of Chicago v. Sanders,* No. 90–C–3063, 1991 WL 442781, at *11 (N.D.Ill. May 15, 1991).

**10.** Section 2727(a) reads in relevant part as follows: "To the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency shall, after timely and meaningful consultation with appropriate private school officials, make provisions for including special educational services and arrangements ... in which such children can participate.... *Expenditures for educational services and arrangements* pursuant to this section *for educationally deprived children in private schools shall be equal* (taking into account the number of children to be served and the special educational needs of such children) *to expenditures for children enrolled in the public schools* of the local educational agency." 20 U.S.C. § 2727(a) (West 1990) (emphasis added).

11. Congress' appropriation for Chapter 1 was $4,327,927,000 in 1988 (Pub.L. No. 100–202, 101 Stat. 1329–275); $4,570,246,000 in 1989 (Pub.L. No. 100–436, 102 Stat. 1701, 1716); $5,425,000,000 in 1990 (H.R.Rep. No. 354, 101st Cong., 1st Sess. 50 (1989)); $6,763,950,000 in 1993 (Pub.L. No. 102–394, 106 Stat. 1792); and $6,924,497,000 in 1994 (Pub.L. No. 103–112; 107 Stat. 1082).[11] Under § 2727(d)(3), Congress authorized the allocation of $30 million in 1988 and $40 million in 1989. Congress later authorized additional funds under § 2727(d)(3): $26 million in 1990 (H.R.Rep. No. 274, 101st Cong. 1st Sess. 90 (1989)); $25 million in 1991 (Pub.L. No. 101–305, 104 Stat. 253); $40 million in 1993 (Pub.L. No. 102–394, 106 Stat. 1792); and $41.5 million in 1994 (Pub.L. No. 103–112, 107 Stat. 1082).[12] Thus, the amounts authorized under § 2727(d) were less than one percent (1%) of the overall Chapter 1 appropriations.[13]

12. Under § 2727(d)(2)(A), the Secretary distributes the appropriated funds to each state according to a statutory formula. Local Educational Agencies (LEAs) apply to the State Educational Agencies (SEAs) to receive the funds, and the SEAs distribute funds to LEAs on the basis of need, according to criteria the SEAs have established. 20 U.S.C. § 2727(d)(1).

13. Although § 2727(d) does not expressly mention *Felton,* § 2727(d) refers to the date of the *Felton* ruling—July 1, 1985—in stating that the money appropriated under that section shall be used for increased capital expenses paid under Chapter 1 after that date.

14. Section 2727(d) funds do not relieve parochial schools of costs previously borne by them. The funds are appropriated for the specific purpose of ensuring that the school districts are able to provide eligible parochial school students with Chapter 1 services comparable to those received by their public school counterparts.

15. Congress enacted 20 U.S.C. § 2727(d) to help defray the costs of providing such off-premises services. *See,* Congressional Record—Senate; December 1, 1987 at p. S.16776 ("We have made provision for a *new* $50 million authorization to alleviate the additional cost of serving private schoolchildren who received Chapter 1 before the Supreme Court's decision.") (emphasis added); *See also,* S.Rep. No. 222, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.Code Cong. & Admin.News 101, 114 ("The Committee has therefore added an additional authorization of $50 million in fiscal year 1989 and 'such sums as may be necessary' through 1993 to assist school districts in complying with the Supreme Court decision. This new authorization is in the form of 'capital expenses' and is to be used solely for the additional cost of delivering services to private school children through alternative means.")

16. Before determining equal Chapter 1 expenditures, an LEA must pay for reasonable and necessary administrative costs of providing services to both public and nonpublic school children, including the type of capital expenditures listed in § 2727(d), from the LEA's whole allocation of funds. 34 C.F.R. § 200.52(a)(2).

17. If Congress did not provide that separate allocation of funds in § 2727(d), the capital expenses described in § 2727(d)(3) would be paid "off-the-top" of the LEA's funds received under Chapter 1.

18. Figures from the late 1980's show that approximately five million students received aid under Chapter 1 every year.[14] Of those five million students, approximately

11. Figures for Congress' appropriations under Chapter 1 for 1991 and 1992 were not available.

12. The amount of Congress' appropriation under § 2727(d) for 1992 was not available.

13. The Court notes that no funds were actually appropriated under § 2727(d) in 1988 and that only $19,760,000 was appropriated in 1989. (Pub.L. No. 100–436, 102 Stat. at 1701, appropriating $20 million for § 2727(d) [referred to as § 1017(d) of Sen. Bill 373], and 102 Stat. at 1716, reducing appropriations by 1.2 percent). However, the actual appropriations are not relevant for the purposes of this facial challenge to the constitutionality of § 2727.

14. Congressional Record—Senate; December 1, 1987; at p. S.16775.

143,000 attended parochial schools.[15] Given these figures, the Court finds that public school students are the primary beneficiaries of funding under Chapter 1.

19. Therefore, the Court finds that, in terms of numbers, public school children clearly benefit from § 2727(d), which makes it possible for the LEAs to deduct fewer administrative costs "off-the-top" and to therefore allocate more of the Chapter 1 funds to the students.

20. Because § 2727(d) may be applied so that the primary beneficiaries of the provision are public school children, the Court finds that § 2727(d) is constitutional.

*CONCLUSIONS OF LAW*

1. In *Aguilar v. Felton,* 473 U.S. at 414, 105 S.Ct. at 3238–39, the Supreme Court held that it is unconstitutional to provide Chapter 1 services on parochial school grounds.

2. After the Supreme Court's decision in *Felton,* Congress reauthorized Chapter 1 and included 20 U.S.C. § 2727(d), which authorized payment of federal funds so that the federal Department of Education could reimburse local school districts for capital expenditures incurred in ensuring that children attending parochial schools are provided with constitutionally permissible off-premises Chapter 1 remedial education services.

3. Section 2727(d) reads as follows:

> (d) **Capital expenses.** (1) A local educational agency may apply to the State educational agency for payments for capital expenses consistent with the provisions of this subsection. State educational agencies shall distribute funds to local educational agencies based on the degree of need as set forth in the application. Such an application shall contain information on such capital expenses by fiscal year and shall contain an assurance that any funds received pursuant to this subsection shall be used solely for purposes of the program authorized by this division.
>
> (2)(A) From the amount appropriated for the purposes of this subsection for any fiscal year, the amount which each State shall be eligible to receive shall be an amount which bears the same ratio to the amount appropriated as the number of children enrolled in private schools who were served under chapter 1 of the Education Consolidation and Improvement Act of 1981 in the State during the period July 1, 1984 through June 30, 1985, bears to the total number of such children served during such period in all States.
>
> (B) Amounts which are not used by a State for the purposes of this subsection shall be reallocated by the Secretary among other States on the basis of need.
>
> (3) There is authorized to be appropriated $30,000,000 for fiscal year 1988, $40,000,000 for the fiscal year 1989, and such sums as may be necessary for each of the fiscal years 1990, 1991, 1992, and 1993.[16] Any sums appropriated under this provision shall be used for increases in capital expenses paid from funds under Chapter 1 of the Education Consolidation and Improvement Act of this section subsequent to July 1, 1985, of local educational agencies in providing the instructional services required under section 557 of the Education Consolidation and Improvement Act and this section, when without such funds, services to private schoolchildren would have been or have been reduced or would be reduced or adversely affected.
>
> (4) For the purposes of this subsection, the term "capital expenses" is limited to expenditures for noninstructional goods and services such as the purchase, lease and renovation of real and personal property (including but not limited to mobile educational units and leasing of neutral sites or space), insurance and maintenance costs, transportation, and other comparable goods and services.

20 U.S.C. § 2727(d).

4. "A facial challenge will succeed only where the plaintiff shows that there is *no* set of circumstances under which the statute

15. House Report 100–95; May 15, 1987, at p. 30.

16. The Court notes that funding under § 2727(d) has continued for fiscal year 1994. Pub.L. No. 103–112, 107 Stat. 1082.

would be constitutional." *Barnes v. Mississippi,* 992 F.2d 1335, 1342 (5th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 468, 126 L.Ed.2d 419 (1993) (citing *Webster v. Reproductive Health Services,* 492 U.S. 490, 524, 109 S.Ct. 3040, 3060, 106 L.Ed.2d 410 (1989)) (O'Connor, J., concurring) (other citations omitted); *see also Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 797–98, 104 S.Ct. 2118, 2124–25, 80 L.Ed.2d 772 (1984) (A court can declare a statute facially invalid if the statute is unconstitutional in every conceivable application or if the statute seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.).

5. The constitutionality of § 2727(d) cannot be determined by viewing that section in isolation from the context of the whole Act of which it is a part. *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962); *In re Timbers of Inwood Forest Associates, Ltd.,* 793 F.2d 1380, 1384 (5th Cir.1986).

6. The Supreme Court has expressly required that public and nonpublic school students receive "comparable" services. *Wheeler v. Barrera,* 417 U.S. 402, 421, 94 S.Ct. 2274, 2285, 41 L.Ed.2d 159 (1974); *see also* 34 C.F.R. § 200.50 (1992) [17] (requiring participation on an "equitable basis").

7. The Supreme Court has held that the Constitution does not require absolute equality of expenditures between public and parochial schools. *Wheeler,* 417 U.S. at 421–22, 94 S.Ct. at 2285–86; *see also Members of Jamestown School Committee v. Schmidt,* 699 F.2d 1, 9 (1st Cir.), *cert. denied,* 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983) (Absolute equality of access or expenditure is not required by the Supreme Court's rulings). A statute is not unconstitutional simply because it spends more money on parochial school students than it does on public school students. *Pulido v. Cavazos,* 934 F.2d 912, 925 (8th Cir.1991); *Board of Education v. Alexander,* 983 F.2d 745, 755 (7th Cir. 1992).

8. In *Wheeler,* 417 U.S. at 425 n. 20, 94 S.Ct. at 2287 n. 20, the Court recognized with approval that Chapter 1 benefits might be delivered to nonpublic school children in "mobile learning centers." In approving the provision of services in separate facilities, the Court indicated that spending additional money to provide services to nonpublic school children was constitutional. *Id.*

9. In *Mueller v. Allen,* 463 U.S. 388, 400–02, 103 S.Ct. 3062, 3069–71, 77 L.Ed.2d 721 (1983), the Supreme Court affirmed the decision of the Eighth Circuit Court of Appeals upholding a state statute that granted parents a tax deduction for amounts spent on their children's tuition, textbooks and transportation despite the fact that the overwhelming majority of the resulting financial benefit went to parents of parochial school students. The Court did not think the disparity was significant because the benefit was available to "all parents"—whether their children attended public or parochial schools. *Id.* at 397, 103 S.Ct. at 3068–69.

10. In *Mueller,* the Supreme Court declared that it has consistently rejected the argument that " 'any program which in some manner aids an institution with a religious affiliation' violates the Establishment Clause." *Id.* at 393, 103 S.Ct. at 3066 (quoting *Hunt v. McNair,* 413 U.S. 734, 742, 93 S.Ct. 2868, 2873–74, 37 L.Ed.2d 923 (1973)).

11. Several federal circuit courts of appeal have addressed the issue of whether allocating "*Felton* costs" "off-the-top" of total Chapter 1 grant funds is constitutional under the Establishment Clause of the First Amendment. *Pulido,* 934 F.2d 912; *Barnes,* 966 F.2d 1056; and *Board of Education v. Alexander,* 983 F.2d 745. "*Felton* costs" are the costs incurred in providing Chapter 1 services outside parochial school buildings in order to comply with the Supreme Court's ruling in *Aguilar v. Felton. Pulido,* 934 F.2d at 924; *Board of Education v. Alexander,* 983 F.2d at 747.

17. 34 C.F.R. § 200.50(a)(1) provides: "An LEA shall provide to educationally deprived children, who reside in a project area of the LEA and who are enrolled in private elementary and secondary schools, special educational services and arrangements as will ensure those children's participation on an *equitable basis....*" (emphasis added).

12. The issue of the constitutionality of allocating "*Felton* costs" off-the-top is very similar to the issue before this Court, the constitutionality of the federal government appropriating funds under 20 U.S.C. § 2727(d) "for increases in capital expenses paid from funds under chapter 1 ... subsequent to July 1, 1985, ... when without such funds, services to private schoolchildren would have been or have been reduced or would be reduced or adversely affected." 20 U.S.C. § 2727(d).

13. Consequently, this Court will look to the cases cited above, *Pulido, Barnes* and *Board of Education v. Alexander* for guidance.

14. In *Pulido,* 934 F.2d at 914, the Eighth Circuit Court of Appeals addressed several issues, including whether allocating the costs incurred as a result of *Felton* "off-the-top," rather than allocating those costs from that portion of the Chapter 1 monies that would otherwise be spent for private school students, was constitutional as applied.[18]

15. The *Pulido* Court found that the "off-the-top" allocation of funds for capital expenditures was not mandated in order to increase the number of private school students benefiting from Chapter 1 services. *Id.* at 926–27. Rather, the court found, "[b]oth private and public school students benefit from the capital expense provision of 20 U.S.C. § 2727(d)(3)." *Id.* at 927.

16. The Eighth Circuit relied on the regulations under § 2727(d), particularly 34 C.F.R. § 200.58(a)(1) (1992):

> The regulations provide that a local educational agency "... shall use payments received under [the capital expenses provision] ... [t]o provide Chapter 1 services to benefit, to the extent possible, the public and private school children, who were or are adversely affected by the [local educational agency's] expenditures for capital expenses."

*Pulido,* 934 F.2d at 927.

17. The *Pulido* Court found that the "*Felton* costs" were necessary in order to provide private school students with comparable services to those of public school children, as mandated by the Supreme Court in *Wheeler,* 417 U.S. at 419, 94 S.Ct. at 2284. *Pulido,* 934 F.2d at 927–28.

18. The *Pulido* Court also held that the allocation of "*Felton* costs" did not "promote a single religion or religion generally." *Id.* at 927–28.

19. The Eighth Circuit concluded that taking "*Felton* costs" off the top of a state's Chapter 1 allocation is constitutional. *Id.* at 928.

20. The Sixth Circuit Court of Appeals held the allocation of "*Felton* costs" to be constitutional. *Barnes,* 966 F.2d at 1065–66.

21. To determine whether the off-the-top allocation was constitutional, the *Barnes* Court asked whether the cost of providing services to parochial school students is "so grossly disproportionate" to the cost of providing comparable services to public school students that the provision of services to the public students is merely a ruse to confer a direct benefit on the sectarian schools. *Id.* at 1062 (citing *Members of Jamestown School Committee,* 699 F.2d at 9–10).

22. The Sixth Circuit was faced with an as-applied challenge to the off-the-top allocation of funds, unlike the facial challenge which confronts this Court. The Sixth Circuit's starting point was that "the statute at issue here is facially neutral—Chapter 1 funds are available to educate both public and private school students. The off-the-top allocation method applies to all administrative expenses, not just those associated with educating private school students." *Id.* at 1064.

23. Applying the "grossly disproportionate test," the *Barnes* Court found the Board's off-the-top allocation of Chapter 1 funds constitutional. 966 F.2d at 1065–66.

24. In *Board of Education v. Alexander,* 983 F.2d at 747, the Court confronted the issue of whether 34 C.F.R. § 200.52(a)(2), which requires that administrative costs be taken "off-the-top," is constitutional under the Establishment Clause.

18. The *Pulido* Court noted that the facial neutrality of Chapter 1 was unquestioned. *Id.* at 926.

25. The Seventh Circuit applied the three-prong test set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), to decide the constitutionality of the regulation; the court applied only the first two prongs because the plaintiff did not argue on appeal that the regulation violated the third prong, excessive entanglement with religion. 983 F.2d at 753.

26. Applying the first prong of the *Lemon* test, the Seventh Circuit held that the regulation has a secular purpose: "to harmonize the mandate of the Supreme Court in *Felton* and the mandate of the Congress for equal educational opportunity." 983 F.2d at 754.

27. To decide the second prong of the *Lemon* test, the Seventh Circuit followed the Supreme Court's analysis in *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). First, the court asked whether the government funding pursuant to the regulation flows directly to a sectarian institution. The court found that it does not, but that the funds are handled by the LEA and the Board of Education, which are public institutions. 983 F.2d at 755.

28. Still following the *Hunt* Court's analysis, the Seventh Circuit sought to determine whether funds were being channeled to a "specifically religious activity in an otherwise substantially secular setting." 983 F.2d at 755. The court determined that the money was going to the basic education of educationally deprived children, regardless of whether they attended private or public schools. *Id.*

29. The Seventh Circuit found that the primary effect of the statute and the regulation was *not* the advancement of any of the sectarian institution's goals. *Id.*

30. In *Board of Education v. Alexander,* the Seventh Circuit concluded that the "off-the-top" regulation did *not* violate the Establishment Clause. *Id.* at 757.

31. In *Everson v. Board of Education,* 330 U.S. 1, 3, 67 S.Ct. 504, 505, 91 L.Ed. 711 (1947), the Supreme Court upheld a New Jersey statute under which a local board of education provided that parents of students attending Catholic schools could be reimbursed for the costs of transporting their children to and from school. The Court stated:

> It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State.

*Id.* at 17, 67 S.Ct. at 512. Similarly, in *Board of Education v. Allen,* 392 U.S. 236, 244, 88 S.Ct. 1923, 1927, 20 L.Ed.2d 1060 (1968), the Supreme Court stated: "Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution."

32. Under the Supreme Court's decisions in *Everson* and *Allen,* if the government provides a secular benefit to nonpublic school children that has the indirect effect of increasing the number of students attending parochial schools, that indirect effect does not render the government aid unconstitutional.

33. Following the rulings of the Eighth Circuit in *Pulido* and of the Seventh Circuit in *Alexander,* this Court will address whether § 2727(d) has a secular purpose and whether the primary effect of § 2727(d) is to advance religion.[19]

34. The Court finds that Chapter 1 serves the valid secular purpose stated in 20 U.S.C. § 2701(b): to improve the educational opportunities of educationally deprived children. Furthermore, § 2727(d) likewise serves a secular purpose: to ensure that private school students receive educational services comparable to those of their public school counterparts.

19. The plaintiffs do not argue that § 2727(d) fosters the state's entanglement with religion. Consequently, the Court need not address the "entanglement test" that is often applied in Establishment Clause cases.

35. In accord with *Pulido,* this Court finds that providing funding for capital expenses for the provision of Chapter 1 services does not impermissibly advance religion: "The program provided to the parochial school students is not different from the program provided to public school students and does not accommodate the religious views of the parochial schools." *Pulido,* 934 F.2d at 921. Just as "off-the-top" allocation of resources does not promote religion, neither does an additional, independent allocation of funds promote religion.

36. The Court finds that § 2727(d) is constitutional on its face because it has a secular purpose and does not have the primary effect of furthering religion.

Accordingly,

**IT IS THE ORDER OF THE COURT** that judgment be entered in favor of plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, and against defendants, Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction; Mary Landrieu as Louisiana State Treasurer; Louisiana State Board of Elementary and Secondary Education (BESE); Jefferson Parish School Board (JPSB); Barbara Turner as Superintendent of the Jefferson Parish Public School System; Martin Marino as President and member of the Jefferson Parish School Board; Polly Thomas as Vice President and member of the Jefferson Parish School Board; Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of the Jefferson Parish School Board; and the Special Educational Services Corporation; and against intervenors, Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch; holding that the Louisiana special education statute, La.Rev.Stat. §§ 17:1941–1956, which allows state-paid special education teachers to teach on the premises of pervasively sectarian institutions, is unconstitutional as applied.

**IT IS THE FURTHER ORDER OF THE COURT** that judgment be entered in favor of defendants, Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction; Mary Landrieu as Louisiana State Treasurer; Louisiana State Board of Elementary and Secondary Education (BESE); Jefferson Parish School Board (JPSB); Barbara Turner as Superintendent of the Jefferson Parish Public School System; Martin Marino as President and member of the Jefferson Parish School Board; Polly Thomas as Vice President and member of the Jefferson Parish School Board; Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley an members of the Jefferson Parish School Board; and the Special Educational Services Corporation; and in favor of intervenors, Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch; and against plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, holding that La.Rev. Stat. §§ 17:1944, 17:1946, 17:1949, and 17:1950 are constitutional on their face.

**IT IS THE FURTHER ORDER OF THE COURT** that judgment be entered in favor of defendants, Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction; Mary Landrieu as Louisiana State Treasurer; Louisiana State Board of Elementary and Secondary Education (BESE); Jefferson Parish School Board (JPSB); Barbara Turner as Superintendent of the Jefferson Parish Public School System; Martin Marino as President and member of the Jefferson Parish School Board; Polly Thomas as Vice President and member of the Jefferson Parish School Board; Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of the Jefferson Parish School Board; and the Special Educational Services Corporation; and in favor of intervenors, Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch; and against plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, holding that the Louisiana Reimbursement of Required Costs statute, La.Rev.Stat. §§ 17:361–365, is constitutional on its face.

**IT IS THE FURTHER ORDER OF THE COURT** that judgment be entered in favor of plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, and against defendants, Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction; Mary Landrieu as Louisiana State Treasurer; Louisiana State Board of Elementary and Secondary Education (BESE); Jefferson Parish School Board (JPSB); Barbara Turner as Superintendent of the Jefferson Parish Public School System; Martin Marino as President and member of the Jefferson Parish School Board; Polly Thomas as Vice President and member of the Jefferson Parish School Board; Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of the Jefferson Parish School Board; and the Special Educational Services Corporation; and against intervenors, Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch; holding that the Louisiana Reimbursement of Required Costs Statute, La. Rev.Stat. § 17:361–365, is unconstitutional as applied.

**IT IS THE FURTHER ORDER OF THE COURT** that judgment be entered in favor of defendants, Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction; Mary Landrieu as Louisiana State Treasurer; Louisiana State Board of Elementary and Secondary Education (BESE); Jefferson Parish School Board (JPSB); Barbara Turner as Superintendent of the Jefferson Parish Public School System; Martin Marino as President and member of the Jefferson Parish School Board; Polly Thomas as Vice President and member of the Jefferson Parish School Board; Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of the Jefferson Parish School Board; and the Special Educational Services Corporation; and in favor of intervenors, Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch; and against plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, holding that the Jefferson Parish School Board's school bus transportation program which results in separate transportation of public and nonpublic school children *is constitutional in its application*.

**IT IS THE FURTHER ORDER OF THE COURT** that judgment be entered in favor of defendants, Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction; Mary Landrieu as Louisiana State Treasurer; Louisiana State Board of Elementary and Secondary Education (BESE); Jefferson Parish School Board (JPSB); Barbara Turner as Superintendent of the Jefferson Parish Public School System; Martin Marino as President and member of the Jefferson Parish School Board; Polly Thomas as Vice President and member of the Jefferson Parish School Board; Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling, Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of the Jefferson Parish School Board; and the Special Educational Services Corporation; and in favor of intervenors, Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch; and against plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, holding that the Jefferson Parish School Board's school bus transportation program does not result in excessive entanglement with the exception of the transportation contracts between Westbank Cathedral Academy and the Jefferson Parish School Board and between Faith Lutheran School and the Jefferson Parish School Board.

**IT IS THE FURTHER ORDER OF THE COURT** that judgment be entered in favor of defendants, Dr. Raymond K. Arveson as the Louisiana Superintendent of Public Instruction; Mary Landrieu as Louisiana State Treasurer; Louisiana State Board of Elementary and Secondary Education (BESE); Jefferson Parish School Board (JPSB); Barbara Turner as Superintendent of the Jefferson Parish Public School System; Martin Marino as President and member of the Jefferson Parish School Board; Polly Thomas as Vice President and member of the Jefferson Parish School Board; Robert Wolfe, Barry Bordelon, O.H. Guidry, Laurie Rolling,

**1166**

Cedric Floyd, Sharon D. Bitzer, and Michael Hurley as members of the Jefferson Parish School Board; and the Special Educational Services Corporation; and in favor of intervenors, Guy and Jan Mitchell; Earline Castillon; and Edward and JacLynn Welsch; and against plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, holding that La.Rev. Stat. § 17:158(C), which authorizes reimbursement to parents transporting their children to school, is constitutional on its face and as previously administered and applied.

**IT IS THE FURTHER ORDER OF THE COURT** that judgment be entered in favor of defendants, Richard W. Riley as Secretary of the United States Department of Education and the United States Department of Education, and against plaintiffs, Mary L. Helms, individually and on behalf of her minor daughter, Amy T. Helms; Marie Louise Schneider; and Esperanza Tizol, holding that the "capital expenditures" provision of Chapter 1 of the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. § 2727(d), is constitutional on its face.

Plaintiffs and defendants are requested to submit a proposed judgment in accordance with the Findings of Fact and Conclusions of Law herein.